JONES, SECRETARY, DEPARTMENT OF CORREC-
TION OF NORTH CAROLINA, ET AL. *v.* NORTH
CAROLINA PRISONERS' LABOR UNION, INC.

No. 75–1874.   Argued April 19, 1977—Decided June 23, 1977

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, BLACKMUN, and POWELL, JJ., joined. BURGER, C. J., filed a concurring opinion, *post*, p. 136. STEVENS, J., filed an opinion concurring in part and dissenting in part, *post*, p. 138. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 139.

*Jacob L. Safron,* Special Deputy Attorney General of North Carolina, argued the cause for appellants. With him on the brief was *Rufus L. Edmisten,* Attorney General.

*Norman B. Smith* argued the cause for appellee. With him on the brief was *Deborah Mailman.*

*Kenneth S. Geller* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were

*Acting Solicitor General Friedman, Assistant Attorney General Thornburgh,* and *Jerome M. Feit.*[*]

Mr. Justice Rehnquist delivered the opinion of the Court.

Pursuant to regulations promulgated by the North Carolina Department of Correction, appellants prohibited inmates from soliciting other inmates to join appellee, the North Carolina Prisoners' Labor Union, Inc. (Union), barred all meetings of the Union, and refused to deliver packets of Union publications that had been mailed in bulk to several inmates for redistribution among other prisoners. The Union instituted this action, based on 42 U. S. C. § 1983, to challenge these policies. It alleged that appellants' efforts to prevent the operation of a prisoners' union violated the First and Fourteenth Amendment rights of it and its members and that the refusal to grant the Union those privileges accorded several other organizations operating within the prison system deprived the Union of equal protection of the laws. A three-judge court was convened. After a hearing, the court found merit in the Union's free speech, association, and equal protection arguments, and enjoined appellants from preventing inmates from soliciting other prisoners to join the Union and from "refus[ing] receipt of the Union's publications on the ground that they are calculated to encourage membership in the organization or solicit joining." The court also held that the Union "shall be accorded the privilege of holding meetings under such limitations and control as are neutrally applied to all inmate organizations . . . ." 409 F. Supp. 937. We noted probable jurisdiction to consider whether the First and Fourteenth Amendments extend prisoner labor unions such protection. 429 U. S. 976. We have decided that they do not, and we accordingly reverse the judgment of the District Court.

---

[*]The Prisoners' Union, Inc., filed a brief as *amicus curiae* urging affirmance.

## I

Appellee, an organization self-denominated as a Prisoners' Labor Union, was incorporated in late 1974, with a stated goal of "the promotion of charitable labor union purposes" and the formation of a "prisoners' labor union at every prison and jail in North Carolina to seek through collective bargaining . . . to improve . . . working . . . conditions. . . ."[1] It also proposed to work toward the alteration or elimination of practices and policies of the Department of Correction which it did not approve of, and to serve as a vehicle for the presentation and resolution of inmate grievances. By early 1975, the Union had attracted some 2,000 inmate "members" in 40 different prison units throughout North Carolina. The State of North Carolina, unhappy with these developments, set out to prevent inmates from forming or operating a "union." While the State tolerated individual "membership," or belief, in the Union, it sought to prohibit inmate solicitation of other inmates, meetings between members of the Union, and bulk mailings concerning the Union from outside sources. Pursuant to a regulation promulgated by the Department of Correction on March 26, 1975, such solicitation and group activity were proscribed.

Suit was filed by the Union in the United States District Court for the Eastern District of North Carolina on March 18, 1975, approximately a week before the date upon which the regulation was to take effect. The Union claimed that its rights, and the rights of its members, to engage in protected free speech, association, and assembly activities were being infringed by the no-solicitation and no-meeting rules. It also alleged a deprivation of equal protection of the laws in that

---

[1] These are the corporation purposes listed in the Articles of Incorporation issued by the Secretary of State of North Carolina. Collective bargaining for inmates with respect to pay, hours of employment, and other terms and conditions of incarceration is illegal under N. C. Gen. Stat. § 95–98 (1975).

the Jaycees and Alcoholics Anonymous were permitted to have meetings and other organizational rights, such as the distribution of bulk mailing material, that the Union was being denied. A declaratory judgment and injunction against continuation of these restrictive policies were sought, as were substantial damages.[2]

A three-judge District Court, convened pursuant to 28 U. S. C. §§ 2281 and 2284, while dismissing the Union's prayers for damages and attorney's fees, granted it substantial injunctive relief. The court found that appellants "permitted" inmates to join the Union, but "oppose[d] the solicitation of other inmates to join," either by inmate-to-inmate solicitation or by correspondence. 409 F. Supp., at 941. The court noted, *id.*, at 942:

> "[Appellants] sincerely believe that the very existence of the Union will increase the burdens of administration and constitute a threat of essential discipline and control. They are apprehensive that inmates may use the Union to establish a power bloc within the inmate population which could be utilized to cause work slowdowns or stoppages or other undesirable concerted activity."

The District Court concluded, however, that there was "no consensus" among experts on these matters, and that it was "left with no firm conviction that an association of inmates is necessarily good or bad . . . ." *Id.*, at 942–943. The court felt that since appellants countenanced the bare fact of Union membership, it had to allow solicitation activity, whether by inmates or by outsiders:

> "We are unable to perceive why it is necessary or essential to security and order in the prisons to forbid

---

[2] Other allegations were contained in the complaint, respecting the opening of outgoing prison mail and the interference with visitation rights of certain paralegals. These specific allegations are not before us, and we will not deal with them further.

solicitation of membership in a union permitted by the authorities. This is not a case of riot. There is not one scintilla of evidence to suggest that the Union has been utilized to disrupt the operation of the penal institutions." *Id.,* at 944.

The other questions, respecting the bulk mailing by the Union of literature into the prisons for distribution and the question of meetings of inmate members, the District Court resolved against appellants "by application of the equal protection clause of the fourteenth amendment." *Ibid.* Finding that such meetings and bulk mailing privileges had been permitted the Jaycees, Alcoholics Anonymous, and, in one institution, the Boy Scouts, the District Court concluded that appellants "may not pick and choose depending on [their] approval or disapproval of the message or purpose of the group" unless "the activity proscribed is shown to be detrimental to proper penological objectives, subversive to good discipline, or otherwise harmful." *Ibid.* The court concluded that appellants had failed to meet this burden. Appropriate injunctive relief was thereupon ordered.[3]

---

[3] Appellants were enjoined as follows:

"(1) Inmates and all other persons shall be permitted to solicit and invite other inmates to join the plaintiff Union orally or by written or printed communication; provided, however, that access to inmates by outsiders solely for the purpose of soliciting membership may be denied except that inmate members of the Union may become entitled to be visited by free persons who are engaged with them in legitimate Union projects to the same extent that other members of free society are admitted for like purposes.

"(2) Free persons otherwise entitled to visitation with inmates, be they attorneys, paralegals, friends, relatives, etc. shall not be denied access to such visitation by reason of their association or affiliation with the Union.

"(3) The Union shall be accorded the privilege of bulk mailing to the extent that such a privilege is accorded other organizations.

"(4) The Union and its inmate members shall be accorded the privilege of holding meetings under such limitations and control as are neutrally

## II

### A

The District Court, we believe, got off on the wrong foot in this case by not giving appropriate deference to the decisions of prison administrators and appropriate recognition to the peculiar and restrictive circumstances of penal confinement. While litigation by prison inmates concerning conditions of confinement, challenged other than under the Eighth Amendment, is of recent vintage, this Court has long recognized that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price* v. *Johnston,* 334 U. S. 266, 285 (1948); see also *Pell* v. *Procunier,* 417 U. S. 817, 822 (1974); *Wolff* v. *McDonnell,* 418 U. S. 539, 555 (1974). The fact of confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment, which are implicit in incarceration. We noted in *Pell* v. *Procunier, supra,* at 822:

> "[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system. Thus, challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law."

Perhaps the most obvious of the First Amendment rights that are necessarily curtailed by confinement are those associational rights that the First Amendment protects outside of prison

---

applied to all inmate organizations, and to the extent that other meetings of prisoners are permitted."

walls. The concept of incarceration itself entails a restriction on the freedom of inmates to associate with those outside of the penal institution. Equally as obvious, the inmate's "status as a prisoner" and the operational realities of a prison dictate restrictions on the associational rights among inmates.

Because the realities of running a penal institution are complex and difficult, we have also recognized the wide-ranging deference to be accorded the decisions of prison administrators. We noted in *Procunier* v. *Martinez,* 416 U. S. 396, 405 (1974):

> "[C]ourts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism. Moreover, where state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities." (Footnote omitted.)

See also *Cruz* v. *Beto,* 405 U. S. 319, 321 (1972). It is in this context that the claims of the Union must be examined.

### B

State correctional officials uniformly testified that the concept of a prisoners' labor union was itself fraught with potential dangers, whether or not such a union intended, illegally, to press for collective-bargaining recognition.[4] Appellant

---

[4] The District Court observed that "it is clear beyond argument that no association of prisoners may operate as a true labor union . . . ." It concluded that "it [is] of no legal significance that the charter purports to authorize more than can lawfully be accomplished." 409 F. Supp. 937, 940 n. 1. But, whether or not illegal activity was actually actively pursued by the Union, it is clear that its announced purpose to engage in collective bargaining is a factor which prison officials may legitimately consider in determining whether the Union is likely to be a disruptive influence, or otherwise detrimental to the effective administration of the North Carolina prison system.

Ralph Edwards, the Commissioner of the Department of Correction, stated in his affidavit:

> "The creation of an inmate union will naturally result in increasing the existing friction between inmates and prison personnel. It can also create friction between union inmates and non-union inmates."

Appellant David Jones, the Secretary of the Department of Correction, stated:

> "The existence of a union of inmates can create a divisive element within the inmate population. In a time when the units are already seriously over-crowded, such an element could aggravate already tense conditions. The purpose of the union may well be worthwhile projects. But it is evident that the inmate organizers could, if recognized as spokesman for all inmates, make themselves to be power figures among the inmates. If the union is successful, these inmates would be in a position to misuse their influence. After the inmate union has become established, there would probably be nothing this Department could do to terminate its existence, even if its activities became overtly subversive to the functioning of the Department. Work stoppages and mutinies are easily foreseeable. Riots and chaos would almost inevitably result. Thus, even if the purposes of the union are as stated in the complaint, the potential for a dangerous situation exists, a situation which could not be brought under control."

The District Court did not reject these beliefs as fanciful or erroneous. It, instead, noted that they were held "sincerely," and were arguably correct.[5]    409 F. Supp., at 942–943.    With-

---

[5] The District Court did hold that there was "not one scintilla of evidence to suggest that the Union has been utilized to disrupt the operation of the penal institutions." *Id.*, at 944. This historical finding, however, does not state that appellants' fears as to future disruptions are ground-

out a showing that these beliefs were unreasonable, it was error for the District Court to conclude that appellants needed to show more. In particular, the burden was not on appellants to show affirmatively that the Union would be "detrimental to proper penological objectives" or would constitute a "present danger to security and order." *Id.*, at 944–945. Rather, "[s]uch considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Pell* v. *Procunier*, 417 U. S., at 827. The necessary and correct result of our deference to the informed discretion of prison administrators permits them, and not the courts, to make the difficult judgments concerning institutional operations in situations such as this.

The District Court, however, gave particular emphasis to what it viewed as appellants' tolerance of membership by inmates in the Union as undermining appellants' position. It viewed a system which permitted inmate "membership" but prohibited inmate-to-inmate solicitation (as well, it should be noted, as meetings, or other group activities) as bordering "on the irrational," and felt that "[t]he defendants' *own* hypothesis in this case is that the existence of the Union and membership in it are not dangerous, for otherwise they would surely have undertaken to forbid membership." 409 F. Supp., at 944. This, however, considerably overstates what appellants' concession as to pure membership entails. Appellants permitted membership because of the reasonable assumption that each individual prisoner could believe what he chose to believe, and that outside individuals should be able to communicate ideas and beliefs to individual inmates. Since a

---

less; there, the court indicated the opposite: "On conflicting expert opinion evidence we are left with no firm conviction that an association of inmates is necessarily good or bad ...." *Id.*, at 943.

member *qua* member incurs no dues or obligations—a prisoner apparently may become a member simply by considering himself a member—this position simply reflects the concept that thought control, by means of prohibiting beliefs, would not only be undesirable but impossible.

But appellants never acquiesced in, or permitted, group activity of the Union in the nature of a functioning organization of the inmates within the prison, nor did the District Court find that they had. It is clearly not irrational to conclude that individuals may believe what they want, but that concerted group activity, or solicitation therefor, would pose additional and unwarranted problems and frictions in the operation of the State's penal institutions. The ban on inmate solicitation and group meetings, therefore, was rationally related to the reasonable, indeed to the central, objectives of prison administration. Cf. *Pell* v. *Procunier, supra,* at 822.

## C

The invocation of the First Amendment, whether the asserted rights are speech or associational, does not change this analysis. In a prison context, an inmate does not retain those First Amendment rights that are "inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell* v. *Procunier, supra,* at 822. Prisons, it is obvious, differ in numerous respects from free society. They, to begin with, are populated, involuntarily, by people who have been found to have violated one or more of the criminal laws established by society for its orderly governance. In seeking a "mutual accommodation between institutional needs and objectives [of prisons] and the provisions of the Constitution that are of general application," *Wolff* v. *McDonnell,* 418 U. S., at 556, this Court has repeatedly recognized the need for major restrictions on a prisoner's rights. See, *e. g., id.,* at 561–562; *Lanza* v. *New York,* 370 U. S. 139, 143 (1962). These restrictions have applied as well

where First Amendment values were implicated. See, *e. g.,* *Pell* v. *Procunier, supra; Procunier* v. *Martinez,* 416 U. S. 396 (1974); *Meachum* v. *Fano,* 427 U. S. 215 (1976).

An examination of the potential restrictions on speech or association that have been imposed by the regulations under challenge, demonstrates that the restrictions imposed are reasonable, and are consistent with the inmates' status as prisoners and with the legitimate operational considerations of the institution. To begin with, First Amendment speech rights are barely implicated in this case.[6] Mail rights are not themselves implicated; the only question respecting the mail is that of *bulk* mailings.[7] The advantages of bulk mailings to inmates by the Union are those of cheaper rates and convenience. While the District Court relied on the cheaper bulk mailing rates in finding an equal protection violation, *infra,* at 133, it is clear that losing these cost advantages does not

---

[6] The State has not hampered the ability of prison inmates to communicate their grievances to correctional officials. In banning Union solicitation or organization, appellants have merely affected one of several ways in which inmates may voice their complaints to, and seek relief, from prison officials. There exists an inmate grievance procedure through which correctional officials are informed about complaints concerning prison conditions, and through which remedial action may be secured. See Affidavit of Director Edwards, App. 127. With this presumably effective path available for the transmission of grievances, the fact that the Union's grievance procedures might be more "desirable" does not convert the prohibitory regulations into unconstitutional acts. See *Procunier* v. *Martinez,* 416 U. S. 396, 413 (1974); cf. *Greer* v. *Spock,* 424 U. S. 828, 847 (1976) (POWELL, J., concurring).

[7] The complaint alleged only that the bulk mail prohibition denied the Union equal protection of the laws:

"The refusal by Defendants to allow the Prisoners' Union Newsletter to arrive in bundles for distribution, while allowing the Jaycee Newsletter to arrive in the same manner violates Plaintiff's Fourteenth Amendment right to equal protection of the laws."

The District Court, likewise, dealt with the bulk mail question only in terms of the Equal Protection Clause of the Fourteenth Amendment. 409 F. Supp., at 944.

fundamentally implicate *free speech* values. Since other avenues of outside informational flow by the Union remain available, the prohibition on bulk mailing, reasonable in the absence of First Amendment considerations, remains reasonable.[8] Cf. *Pell* v. *Procunier, supra; Saxbe* v. *Washington Post Co.,* 417 U. S. 843 (1974).

Nor does the prohibition on inmate-to-inmate solicitation of membership trench untowardly on the inmates' First Amendment speech rights. Solicitation of membership itself involves a good deal more than the simple expression of

---

[8] The ban on bulk mailing by the Union does not extend to individual mailings to individual inmates. In his affidavit, Director Edwards stated:
"They are permitted to receive publications sent to them directly, but they are prohibited from receiving packets of material from unions or any other source for redistribution. This is in accordance with the Department's policy requiring publication[s] mailed to inmates to be sent directly from the publisher. A serious security problem would result if inmates could receive packets of material and then redistribute them as they see fit. It would be impossible for the Department to inspect every magazine, every book, etc., to insure that no contraband had been placed inside the publication. The exception in regard to Jaycees is based on the recognized fact that the Jaycees are substantial citizens from the free community who are most unlikely to attempt to smuggle contraband into the union or disseminate propaganda subversive of the legitimate purposes of the prison system." App. 129.
See also N. C. Department of Correction Guidebook, Commissioner's Administrative Directives—Publications Received by Inmates, App. 138–139. As the State has disavowed any intention of interfering with correspondence between outsiders and individual inmates in which Union matters are discussed, we do not have to discuss questions of the First Amendment right of inmates, or outsiders, see *Procunier* v. *Martinez, supra,* at 408–409, in the context of a total prohibition on the communication of information about the Union. The District Court apparently thought that *solicitation* by means of correspondence is prohibited, even if the general discussion of Union affairs is not, 409 F. Supp., at 941. The Union does not press this point here, and it is not alleged in its complaint, but, clearly, if the appellants are permitted to prohibit solicitation activities, they may prohibit solicitation activities by means which use the mails.

individual views as to the advantages or disadvantages of a union or its views; it is an invitation to collectively engage in a legitimately prohibited activity. If the prison officials are otherwise entitled to control organized union activity within the prison walls, the prohibition on solicitation for such activity is not then made impermissible on account of First Amendment considerations, for such a prohibition is then not only reasonable but necessary. *Pell* v. *Procunier,* 417 U. S., at 822.

First Amendment associational rights, while perhaps more directly implicated by the regulatory prohibitions, likewise must give way to the reasonable considerations of penal management. As already noted, numerous associational rights are necessarily curtailed by the realities of confinement. They may be curtailed whenever the institution's officials, in the exercise of their informed discretion, reasonably conclude that such associations, whether through group meetings or otherwise, possess the likelihood of disruption to prison order or stability, or otherwise interfere with the legitimate penological objectives of the prison environment. As we noted in *Pell* v. *Procunier, supra,* at 823, "central to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves."

Appellant prison officials concluded that the presence, perhaps even the objectives, of a prisoners' labor union would be detrimental to order and security in the prisons, *supra,* at 127. It is enough to say that they have not been conclusively shown to be wrong in this view. The interest in preserving order and authority in the prisons is self-evident. Prison life, and relations between the inmates themselves and between the inmates and prison officials or staff, contain the ever-present potential for violent confrontation and conflagration. *Wolff* v. *McDonnell,* 418 U. S., at 561–562. Responsible prison officials must be permitted to take reasonable steps to forestall such a threat, and they must be permitted to act before the

time when they can compile a dossier on the eve of a riot.[9] The case of a prisoners' union, where the focus is on the presentation of grievances to, and encouragement of adversary relations with, institution officials surely would rank high on anyone's list of potential trouble spots. If the appellants' views as to the possible detrimental effects of the organizational activities of the Union are reasonable, as we conclude they are, then the regulations are drafted no more broadly than they need be to meet the perceived threat—which stems directly from group meetings and group organizational activities of the Union. Cf. *Procunier* v. *Martinez,* 416 U. S., at 412–416. When weighed against the First Amendment rights asserted, these institutional reasons are sufficiently weighty to prevail.

## D

The District Court rested on the Equal Protection Clause of the Fourteenth Amendment to strike down appellants' prohibition against the receipt and distribution of bulk mail from the Union as well as the prohibition of Union meetings among the inmates. It felt that this was a denial of equal protection because bulk mailing and meeting rights had been extended to the Jaycees, Alcoholics Anonymous, and the Boy Scouts. The court felt that just as outside the prison, a "government may not pick and choose depending upon its approval or disapproval of the message or purpose of the group," 409 F. Supp., at 944, so, too, appellants could not choose among groups without first demonstrating that the activity proscribed is "detrimental to proper penological objectives, subversive to good discipline, or otherwise harmful." *Ibid.*

This analysis is faulty for two reasons. The District Court

---

[9] The informed discretion of prison officials that there is potential danger may be sufficient for limiting rights even though this showing might be "unimpressive if . . . submitted as justification for governmental restriction of personal communication among members of the general public." *Pell* v. *Procunier,* 417 U. S. 817, 825 (1974).

erroneously treated this case as if the prison environment were essentially a "public forum." We observed last Term in upholding a ban on political meetings at Fort Dix that a Government enclave such as a military base was not a public forum. *Greer* v. *Spock,* 424 U. S. 828 (1976). We stated, *id.,* at 838 n. 10:

> "The fact that other civilian speakers and entertainers had sometimes been invited to appear at Fort Dix did not of itself serve to convert Fort Dix into a public forum or to confer upon political candidates a First or Fifth Amendment right to conduct their campaigns there. The decision of the military authorities that a civilian lecture on drug abuse, a religious service by a visiting preacher at the base chapel, or a rock musical concert would be supportive of the military mission of Fort Dix surely did not leave the authorities powerless thereafter to prevent any civilian from entering Fort Dix to speak on any subject whatever."

A prison may be no more easily converted into a public forum than a military base. Thus appellants need only demonstrate a rational basis for their distinctions between organizational groups. Cf. *City of Charlotte* v. *Firefighters,* 426 U. S. 283 (1976). Here, appellants' affidavits indicate exactly why Alcoholics Anonymous and the Jaycees have been allowed to operate within the prison. Both were seen as serving a rehabilitative purpose, working in harmony with the goals and desires of the prison administrators, and both had been determined not to pose any threat to the order or security of the institution.[10] The affidavits indicate that the administra-

---

[10] Director Edwards listed the objectives for which the Jaycees had been allowed within the North Carolina prison system, namely the "productive association [of inmates] with stable community representatives and the accomplishment of service projects to the community . . . ." When these objectives cease, "the functions of the organization and its oppor-

tors' view of the Union differed critically in both these respects.[11]

Those conclusions are not unreasonable. Prison administrators may surely conclude that the Jaycees and Alcoholics Anonymous differ in fundamental respects from appellee Union, a group with no past to speak of, and with the avowed intent to pursue an adversary relationship with the prison officials. Indeed, it would be enough to distinguish the Union from Alcoholics Anonymous to note that the chartered purpose of

---

tunities to assemble as an organization would also cease." Affidavit of Director Edwards, App. 125. With respect to Alcoholics Anonymous, he stated, *id.,* at 126:

"The objectives of the Alcoholics Anonymous Program are to provide therapeutic support, insight, and an opportunity for productive sharing of experiences among those who have encountered the deteriorative effects of alcoholism. Alcoholics Anonymous is structured on a peer pressure basis which begins while the individual client is confined and is intended to have carry over effects into Alcoholic Anonymous groups in the free community."

[11] With respect to Alcoholics Anonymous and the Jaycees, Director Edwards stated, *ibid.:*

"The goals and the objectives of [both] the Alcoholics Anonymous and the Jaycee Program were presented to correctional staff as meaningful courses of action with positive goals relative to the productive restoration of offenders to active, lawful participation in the community. The goals of both organizations [were] scrutinized, evaluated, and approved. Operational guidelines have been drawn up in each instance following approval to certify that the primary objective of the correctional system—to maintain order and security—would not be abridged by the operation of these programs within the confines of prison units."

Opposed to these articulated reasons for allowing these groups is his statement with respect to the Union, *ibid.:*

"The Division of Prisons was unable to validate a substantive rehabilitation purpose or associative purpose in the design of the organization. To accept the organizational objectives of a prisoner's union would be to approve an organization whose design and purpose would compromise the order and security of the correctional system."

See also *supra,* at 127.

the Union, apparently pursued in the prison, was illegal under North Carolina law.[12]

Since a prison is most emphatically not a "public forum," these reasonable beliefs of appellants are sufficient, cf. *Greer* v. *Spock, supra; City of Charlotte* v. *Firefighters, supra.* The District Court's further requirement of a demonstrable showing that the Union was in fact harmful is inconsistent with the deference federal courts should pay to the informed discretion of prison officials. *Procunier* v. *Martinez,* 416 U. S., at 405. It is precisely in matters such as this, the decision as to which of many groups should be allowed to operate within the prison walls, where, confronted with claims based on the Equal Protection Clause, the courts should allow the prison administrators the full latitude of discretion, unless it can be firmly stated that the two groups are so similar that discretion has been abused. That is surely not the case here. There is nothing in the Constitution which requires prison officials to treat all inmate groups alike where differentiation is necessary to avoid an imminent threat of institutional disruption or violence. The regulations of appellants challenged in the District Court offended neither the First nor the Fourteenth Amendment, and the judgment of that court holding to the contrary is

*Reversed.*

MR. CHIEF JUSTICE BURGER, concurring.

I concur fully in the Court's opinion.

This is but another in a long line of cases in the federal courts raising questions concerning the authority of the States

---

[12] See n. 1, *supra.* It was acknowledged at oral argument that the Union newsletter has since reiterated the Union's goal, as stated in the charter, and that the newsletter has contained authorization cards whereby the inmate could "authorize the agents or representatives of said Union to represent me and to act as a collective bargaining agent in all matters pertaining to rates of pay, hours of employment and all other terms and conditions of incarceration." Record 25. See Tr. of Oral Arg. 31, 34–35.

to regulate and administer matters peculiarly local in nature. Too often there is confusion as to what the Court decides in this type of case. The issue here, of course, is not whether prisoner "unions" are "good" or "bad," but, rather, whether the Federal Constitution prohibits state prison officials from deciding to exclude such organizations of inmates from prison society in their efforts to carry out one of the most vexing of all state responsibilities—that of operating a penological institution. In determining that it does not, we do not suggest that prison officials could not or should not permit such inmate organizations, but only that the Constitution does not require them to do so.

The solutions to problems arising within correctional institutions will never be simple or easy. Prisons, by definition, are closed societies populated by individuals who have demonstrated their inability, or refusal, to conform their conduct to the norms demanded by a civilized society. Of necessity, rules far different from those imposed on society at large must prevail within prison walls. The federal courts, as we have often noted, are not equipped by experience or otherwise to "second guess" the decisions of state legislatures and administrators in this sensitive area except in the most extraordinary circumstances. This recognition, of course, does not imply that a prisoner is stripped of all constitutional protection as he passes through the prison's gates. Indeed, this Court has made clear on numerous occasions that the Constitution and other federal laws protect certain basic rights of inmates. *E. g., Bounds* v. *Smith,* 430 U. S. 817 (1977). Rather, it "reflects no more than a healthy sense of realism" on our part to understand that needed reforms in the area of prison administration must come, not from the federal courts, but from those with the most expertise in this field—prison administrators themselves. See *Procunier* v. *Martinez,* 416 U. S. 396, 405 (1974). And, in the last half dozen years, enlightened correctional administrators have made significant strides in the area of prison reform.

Notable in this respect are the grievance procedures instituted by the Federal Bureau of Prisons* after pilot experiments, and now by a number of States including North Carolina, which permit inmates to register their complaints with penal officials and obtain nonjudicial relief. However, while I applaud such procedures, and indeed urged their adoption, W. Burger, Report on the Federal Judicial Branch—1973, 59 A. B. A. J. 1125 (1973), I do not suggest that the procedures are constitutionally mandated. Similarly, we do not pass today on the "social utility" of inmate organizations, whether they be characterized as "unions" or otherwise, but only on whether the Constitution requires prison officials to permit their operation.

Mr. Justice Stevens, concurring in part and dissenting in part.

My disagreement with the Court is extremely narrow. The Court has not sanctioned a restraint on discussion between inmates on the relative advantages or disadvantages of belonging to a prisoners' union. The prohibition of inmate-to-inmate solicitation which the Court upholds is defined as "an invitation to collectively engage in a legitimately prohibited activity." *Ante,* at 132. The Court has made it clear that mere membership in a union is not such an activity, *ante,* at 128–129. The language of appellants' "no-solicitation regula-

---

*Statistics compiled by the Federal Bureau of Prisons indicate that in 1975 alone, more than 5,000 complaints by inmates were brought to the attention of federal prison officials pursuant to the grievance procedures. Approximately one-fourth of these complaints were ultimately resolved in favor of the inmate. Preliminary figures for 1976 indicate an even greater utilization of the grievance procedures; it is estimated that more than 10,000 complaints were registered by inmates during that year. Brief for United States as *Amicus Curiae* 31–32, n. 15. The development of this grievance procedure appears to have slowed down the rate of growth of federal prisoner petitions filed in the federal district courts. 1975 Annual Report of the Director, Administrative Office of the United States Courts XI48–XI51.

tion" is, however, somewhat broader.\* Therefore, instead of concluding that the entire regulation is valid, *ante,* at 136, I would hold it invalid to the extent that it exceeds the Court's definition.

I join the portions of the Court's opinion concerning the bulk mailing and union meeting claims.

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN joins, dissenting.

There was a time, not so very long ago, when prisoners were regarded as "slave[s] of the State," having "not only forfeited [their] liberty, but all [their] personal rights . . . ." *Ruffin* v. *Commonwealth,* 62 Va. 790, 796 (1871). In recent years, however, the courts increasingly have rejected this view, and with it the corollary which holds that courts should keep their "hands off" penal institutions.[1] Today, however, the Court, in apparent fear of a prison reform organization that has the temerity to call itself a "union," takes a giant step backwards toward that discredited conception of prisoners' rights and the role of the courts. I decline to join in what I hope will prove to be a temporary retreat.

I

In *Procunier* v. *Martinez,* 416 U. S. 396 (1974), I set forth at some length my understanding of the First Amendment rights of prison inmates. The fundamental tenet I advanced is simply stated: "A prisoner does not shed . . . basic First Amendment rights at the prison gate. Rather, he 'retains all the rights of an ordinary citizen except those expressly, or by necessary implication, taken from him by law.' *Coffin* v.

---

\*"Persons in the custody of the Department of Correction are prohibited from soliciting other inmates about membership in any inmate union." Jurisdictional Statement 38.

[1] For brief exposition of the "hands-off" doctrine and its demise, see Fox, The First Amendment Rights of Prisoners, 63 J. Crim. L. C. & P. S. 162 (1972).

*Reichard,* 143 F. 2d 443, 445 (CA6 1944)." *Id.,* at 422 (concurring opinion). It follows from this tenet that a restriction on the First Amendment rights of prisoners, like a restriction on the rights of nonprisoners, "can only be justified by a substantial government interest and a showing that the means chosen to effectuate the State's purpose are not unnecessarily restrictive of personal freedoms." *Id.,* at 423. This does not mean that any expressive conduct that would be constitutionally protected outside a prison is necessarily protected inside; as I also stated in *Martinez:* "[T]he First Amendment must in each context 'be applied "in light of the special characteristics of the . . . environment,"' *Healy* v. *James,* 408 U. S. 169, 180 (1972), and the exigencies of governing persons in prisons are different from and greater than those in governing persons without." *Id.,* at 424. But the basic mode of First Amendment analysis—the requirement that restrictions on speech be supported by "reasons imperatively justifying the particular deprivation," *ibid.*—should not be altered simply because the First Amendment claimants are incarcerated.

The Court today rejects this analytic framework, at least as it applies to the right of prisoners to associate in something called a prison "union." [2] In testing restrictions on the exercise of that right the Court asks only whether the restrictions are "rationally related to the . . . objectives of prison administration," *ante,* at 129, and whether the reasons offered in defense of the restrictions have been "conclusively shown to be wrong," *ante,* at 132. While proclaiming faithfulness to the teaching of *Pell* v. *Procunier,* 417 U. S. 817, 822 (1974), that " 'a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner,' " *ante,* at 125, the Court ultimately upholds the challenged regulations

---

[2] That the First Amendment protects the right to associate is by now well established. See, *e. g., Kusper* v. *Pontikes,* 414 U. S. 51 (1973); *NAACP* v. *Alabama,* 357 U. S. 449 (1958).

on a ground that would apply to any restriction on inmate freedom: they "are consistent with the inmates' status as prisoners," *ante,* at 130.

Nothing in the Court's opinion justifies its wholesale abandonment of traditional principles of First Amendment analysis. I realize, of course, that "the realities of running a penal institution are complex and difficult," *ante,* at 126, and that correctional officers possess considerably more " 'professional expertise,' " *ante,* at 128, in prison management than do judges. I do not in any way minimize either the seriousness of the problems or the significance of the expertise. But it does seem to me that "the realities of running" a school or a city are also "complex and difficult," and that those charged with these tasks—principals, college presidents, mayors, councilmen, and law enforcement personnel—also possess special "professional expertise," [3] Yet in no First Amendment case of which I am aware has the Court deferred to the judgment of such officials simply because their judgment was "rational." Cf. *Healy* v. *James,* 408 U. S. 169 (1972); *Tinker* v. *Des Moines School Dist.,* 393 U. S. 503 (1969); *Cox* v. *Louisiana,* 379 U. S. 536, 544–551 (1965); *Edwards* v. *South Carolina,* 372 U. S. 229 (1963). I do not understand why a different rule should apply simply because prisons are involved.

The reason courts cannot blindly defer to the judgment of prison administrators—or any other officials for that matter—is easily understood. Because the prison administrator's business is to maintain order, "there inheres the danger that he may well be less responsive than a court—part of an independent branch of government—to the constitutionally protected interests in free expression." *Freedman* v. *Maryland,* 380 U. S. 51, 57–58 (1965). A warden seldom will find himself subject to public criticism or dismissal because he

---

[3] Similarly, prison administrators, principals, college presidents, and the like "must be permitted to act before the time when they can compile a dossier on the eve of a riot." *Ante,* at 132–133.

needlessly repressed free speech; indeed, neither the public nor the warden will have any way of knowing when repression was unnecessary. But a warden's job can be jeopardized and public criticism is sure to come should disorder occur. Consequently, prison officials inevitably will err on the side of too little freedom. That this has occurred in the past is made clear by the recent report of the American Bar Association Joint Committee on the Legal Status of Prisoners:

> "All organizations including correctional organizations overreact to suggested changes, whether sweeping or merely incremental. . . . [M]any of the fears voiced by prison officials in the 1960s to the growing tide of court determinations invalidating prison regulations have simply not come to pass; indeed, in several instances . . . those groups feared by the prisons in the 1960s have become stablilizing influences in the 1970s." [4]

I do not mean to suggest that the views of correctional officials should be cavalierly disregarded by courts called upon to adjudicate constitutional claims of prisoners. Far from it. The officials' views " 'constitute a body of experience and informed judgment to which courts . . . may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning . . . and all those factors which give it power to persuade . . . ,' " *General Electric Co.* v. *Gilbert,* 429 U. S. 125, 142 (1976), quoting *Skidmore* v. *Swift & Co.,* 323 U. S. 134, 140 (1944). My point is simply that the ultimate responsibility for evaluating the prison officials' testimony, as well as any other expert testimony, must rest with the courts, which are required to reach an independent judg-

---

[4] ABA Joint Committee on the Legal Status of Prisoners, The Legal Status of Prisoners (Tent. Draft 1977), in 14 Am. Crim. L. Rev. 377, 419 (1977) (hereafter ABA Joint Committee report).

ment concerning the constitutionality of any restriction on expressive activity.

The approach I advocate is precisely the one this Court has followed in other cases involving the rights of prisoners. In *Johnson* v. *Avery,* 393 U. S. 483 (1969), for example, the Court expressly acknowledged the rationality of the rule at issue which prohibited inmate writ writers from aiding fellow prisoners in preparing legal papers, *id.,* at 488. We nevertheless concluded that the rule was unconstitutional because of its impact on prisoners' right of access to the courts. In *Lee* v. *Washington,* 390 U. S. 333 (1968), we did not even inquire whether segregating prisoners by race was rational, although it could be argued that integration in a southern prison would lead to disorder among inmates; we held that in any event segregation was prohibited by the Fourteenth Amendment. And in *Bounds* v. *Smith,* 430 U. S. 817 (1977); *Wolff* v. *McDonnell,* 418 U. S. 539 (1974); and *Cruz* v. *Beto,* 405 U. S. 319 (1972), we followed the approach of *Lee.* By word and deed, then, we have repeatedly reaffirmed that "a policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims . . . . When a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights." *Procunier* v. *Martinez,* 416 U. S., at 405.

## II

Once it is established that traditional First Amendment principles are applicable in prisoners'-rights cases, the dispute here is easily resolved. The three-judge court not only found that there was "not one scintilla of evidence to suggest that the Union had been utilized to disrupt the operation of the penal institutions," 409 F. Supp. 937, 944 (EDNC 1976), as the Court acknowledges, *ante,* at 127 n. 5, it also found no evidence "that the inmates intend to operate [the Union] to

hamper and interfere with the proper interests of government," 409 F. Supp., at 944, or that the Union posed a "present danger to security and order," *id.,* at 945. In the face of these findings, it cannot be argued that the restrictions on the Union are "imperatively justif[ied]."

The regulation barring inmates from soliciting fellow prisoners to join the Union is particularly vulnerable to attack. As the late Judge Craven stated for the court below: "To permit an inmate to join a union and forbid his inviting others to join borders on the irrational." *Id.,* at 943. The irrationality of the regulation is perhaps best demonstrated by the fact that the Court does not defend it; rather, as my Brother STEVENS suggests, *ante,* at 138–139, the Court defends some hypothetical regulation banning " 'an invitation to collectively engage in a legitimately prohibited activity.' *Ante,* at 132"; see also *ante,* at 129 (discussing ban on "concerted group activity, or solicitation therefor"). Because the actual regulation at issue here needlessly bars solicitation for an activity—joining the Union—which is not and presumably could not be prohibited,[5] I would hold it unconstitutional.

Once the rule outlawing solicitation is invalidated, the prohibition on bulk mailing by the Union must fall with it. Since North Carolina allows the Union to mail its newsletters to prisoners individually, the State cannot claim that the bulk mail rule serves to keep "subversive material" out of the prison. Rather, the primary purpose of the rule must be to supplement the ban on solicitation;[6] overturning that ban

---

[5] I express no view concerning the extent to which orderly, concerted activities are protected in prison. This issue has been addressed at length by the ABA Joint Committee report, Standard § 6.4 and Commentary.

[6] The only other justification offered for the rule is to prevent contraband from being smuggled into the prisons. Nothing in the record remotely suggests that the outside personnel associated with the Union would use bulk mailing for this purpose. Moreover, the solution to the

would sap all force from the rationale for excluding bulk mailings. The exclusion would then be left as one that unnecessarily increases the cost to the Union of exercising its First Amendment rights [7] while allowing other inmate groups such as the Jaycees to exercise their rights at a lower price. It would, therefore, be plainly unconstitutional.

The regulation prohibiting the Union from holding meetings within the prison is somewhat more justifiable than the regulations previously considered. Once the Union is permitted to hold meetings it will become operational within the prisons. Appellants' fears that the leaders of an operating union "would be in a position to misuse their influence" and that the Union itself could engage in disruptive, concerted activities or increase tension within the prisons, App. 121, are not entirely fanciful. It is important to note, however, that appellee's two expert witnesses, both correctional officers who had dealt with inmate reform organizations, testified that such groups actually play a constructive role in their prisons, *id.*, at 38, 90–95. The weight of professional opinion seems to favor recognizing such groups.[8] Moreover, the risks appellants fear are inherent in any inmate organization, no matter how innocuous its stated goals; indeed, even without any organizations some inmates inevitably will become leaders capable

---

alleged contraband danger is to inspect the bulk mailings, not to prohibit them.

[7] Contrary to the Court's assertion, *ante,* at 130–131, free speech values most definitely are implicated by a regulation whose purpose and effect is to make the exercise of First Amendment rights costly. Cf., *e. g., Murdock* v. *Pennsylvania,* 319 U. S. 105 (1943); *Grosjean* v. *American Press Co.,* 297 U. S. 233 (1936).

[8] See ABA Joint Committee report, Standard § 6.4 and Commentary; S. Krantz, R. Bell, J. Brant, & M. Magruder, Model Rules and Regulations on Prisoners' Rights and Responsibilities, Rules IA–1b, IA–5 and Commentary (1973); National Advisory Commission on Criminal Justice Standards and Goals, Corrections, Standard 2.15 and Commentary, pp. 58–61 (1973).

146

of "misus[ing] their influence," *id.*, at 84–86, 102–103,[9] and some concerted activity can still occur, *id.*, at 118–119. .

But even if the risks posed by the Union were unique to it, and even if appellants' fear of the Union were more widely shared by other professionals, the prohibition on Union meetings still could not survive constitutional attack. The central lesson of over a half century of First Amendment adjudication is that freedom is sometimes a hazardous enterprise, and that the Constitution requires the State to bear certain risks to preserve our liberty. See, *e. g., Whitney* v. *California,* 274 U. S. 357, 375–378 (1927) (Brandeis, J., concurring); *Terminiello* v. *Chicago,* 337 U. S. 1 (1949); *Tinker* v. *Des Moines School Dist.,* 393 U. S. 503 (1969). As the ABA Joint Committee, *supra,* put it: "The doubts and risks raised by creating a humane and open prison must be accepted as a cost of our society; democracy is self-definitionally a risk-taking form of government."[10] To my mind, therefore, the fact that appellants have not acted wholly irrationally in banning Union meetings is not dispositive. Rather, I believe that where, as here, meetings would not pose an immediate and substantial threat to the security or rehabilitative functions of the prisons, the First Amendment guarantees Union members the right to associate freely, and the Fourteenth Amendment guarantees them the right to be treated as favorably as members of other inmate organizations. The State can surely regulate the time, place, and manner of the meetings, and perhaps can monitor them to assure that disruptions are not planned, but the State cannot outlaw such assemblies altogether.

[9] See also Note, Bargaining in Correctional Institutions: Restructuring the Relation between the Inmate and the Prison Authority, 81 Yale L. J. 726 (1972). The concern over inmate leadership has been advanced to oppose numerous prison reforms. *E. g., Johnson* v. *Avery,* 393 U. S. 483, 499 (1969) (WHITE, J., dissenting); *Saxbe* v. *Washington Post Co.,* 417 U. S. 843, 866–869 (1974) (POWELL, J., dissenting) (rejecting argument).

[10] ABA Joint Committee report 419.

## III

If the mode of analysis adopted in today's decision were to be generally followed, prisoners eventually would be stripped of all constitutional rights, and would retain only those privileges that prison officials, in their "informed discretion," deigned to recognize. The sole constitutional constraint on prison officials would be a requirement that they act rationally. Ironically, prisoners would be left with a right of access to the courts, see *Bounds* v. *Smith,* 430 U. S. 817 (1977); *Johnson* v. *Avery,* 393 U. S. 483 (1969), but no substantive rights to assert once they get there. I cannot believe that the Court that decided *Bounds* and *Johnson*—the Court that has stated that "[t]here is no iron curtain drawn between the Constitution and the prisons of this country," *Wolff* v. *McDonnell,* 418 U. S., at 555–556, and that "[a] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner," *Pell* v. *Procunier,* 417 U. S., at 822—intends to allow this to happen. I therefore believe that the tension between today's decision and our prior cases ultimately will be resolved, not by the demise of the earlier cases, but by the recognition that the decision today is an aberration, a manifestation of the extent to which the very phrase "prisoner union" is threatening to those holding traditional conceptions of the nature of penal institutions.

I respectfully dissent.