Steven E. THOMAS, John F. Yarbrough, Jr., Donald S. Glew, and Tim Maynard, Plaintiffs,

v.

UNITED STATES SECRETARY OF DE-FENSE, Colonel Gordon N. Zelez, and United States Disciplinary Barracks Literary Advisory Board, Defendants.

Civ. A. No. 87–4272–S.

United States District Court, D. Kansas.

Jan. 25, 1990.

Gerald J. Domitrovic, Wichita, Kan., for plaintiffs.

Benjamin L. Burgess and David M. Cooper, Asst. U.S. Attys., Topeka, Kan., for defendants.

MEMORANDUM AND ORDER

SAFFELS, District Judge.

This matter was tried to the court on September 11 and 12, 1989. In this case, certain present and former inmates of the United States Disciplinary Barracks (USDB) at Leavenworth, Kansas, challenge the constitutionality of a regulation, USDB Reg. No. 28–1, which denies them the right to receive certain literature through incom-

ing mail. Also, plaintiffs challenge the USDB's denial of their request to form a "white ethnic club." The court has considered the testimony presented at trial and has reviewed the exhibits admitted into evidence and the post-trial depositions and submissions of the parties. Accordingly, the court issues the following findings of fact and conclusions of law, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

1. Plaintiff Steven E. Thomas and plaintiff John F. Yarbrough, Jr. are white inmates confined to the United States Disciplinary Barracks (USDB) at Leavenworth, Kansas. Plaintiff Donald S. Glew and plaintiff Tim Maynard were inmates at the USDB during much of the relevant time involved in this lawsuit.

2. The named defendants are the United States Secretary of Defense, the commandant of the USDB, and the USDB Literary Advisory Board. Defendants have been sued in their official capacities only.

3. The USDB is a maximum security institution and houses approximately 1500 inmates. Some of the inmates have been convicted of murder and violent sex crimes. Thus, security and internal order has been cited as a major consideration for actions taken by the officials at the USDB.

4. All printed material mailed to inmates at the disciplinary barracks is screened in accordance with USDB Regulation No. 28–1. Section 7(c)(3) of this regulation prohibits printed material from being delivered to an inmate if the material "communicates information designed to encourage prisoners to disrupt the institution by strikes, riots, racial or religious hatred."

5. Printed material that is considered questionable for release to inmates under Regulation 28–1 is set aside by mailroom personnel for review by the supervisor of the USDB personal property section.

6. After reviewing a particular publication, the supervisor may either permit it to be delivered to the inmate or refer it to the Literary Advisory Board (LAB) for further review.

7. The LAB meets approximately once a month, and is composed of representatives from the Directorate of Mental Health, the Directorate of Custody, the Directorate of Training Academic Division, the Command Judge Advocate, the Staff Chaplin, Recreation Services, and the Correctional Guidance Section. The director of mental health serves as chairperson of the LAB.

8. The LAB serves as an advisory board to the commandant and recommends what reading material should be excluded from the inmate population in accordance with the guidelines in USDB Regulation No. 28–1. The LAB reviews each publication individually and determines, by majority vote, whether to recommend exclusion of the publication. Thereafter, minutes of each meeting are forwarded to the commandant.

9. After reviewing the recommendations of the LAB, the commandant approves or disapproves the recommendations in whole or in part.

10. On several occasions, certain publications addressed to the plaintiffs in this case have been rejected and excluded from delivery because the LAB and the commandant have determined that the publications contain information "designed to encourage prisoners to disrupt the institution by strikes, riots, fights, racial or religious hatred" in violation of Reg. No. 28–1. The excluded publications include issues of *The National Vanguard, The National Association for the Advancement of White People* newspaper, and publications of "WAR" (the White Aryan Resistance).

11. On at least one occasion similar literature was not stopped by the mailroom and plaintiffs received the literature.

12. USDB inmates are allowed to receive a wide range of magazines and reading material through the mails.

13. Currently, two inmate cultural groups are officially recognized at the USDB: the Afro–America Culture Organization and the Latin Studies Group. The purpose of these inmate cultural support groups is to assist inmate rehabilitation,

promote inmate mental health, educate inmates in minority cultures, provide inmates an opportunity to exercise organizational abilities, and provide an additional recreational outlet. A USDB cadre is present at all such meetings.

14. In 1986, plaintiffs requested that the Directorate of Mental Health support the formation of a white study group to be given the name "European Heritage Club." This request was denied.

15. The court finds the testimony of Colonel Ray B. Smith, who has been director of mental health at the USDB since November 1986, to be quite credible and reliable. According to Colonel Smith's testimony at trial, he determined that the inmates' request to form a European Heritage Group posed a potential security threat and served no rehabilitative purpose. Colonel Smith testified that USDB officials believed that the group was an attempt to form a racist organization rather than a study group. Colonel Smith testified that in his opinion such a group would be disruptive to the institution. Colonel Smith testified that the decision to deny the formation of such group was based also on the small number of inmates interested in forming the group and the lack of available resources for the barracks to accommodate such a group.

## CONCLUSIONS OF LAW

Plaintiffs contend that USDB disciplinary barracks' Regulation No. 28–1 violates the First Amendment of the United States Constitution on its face and as applied in this particular case. Also, plaintiffs contend that the defendants' refusal to allow the formation of a European Heritage Club violates their Fifth Amendment rights to due process and equal protection under the law.

A. *Censorship of Incoming Mail.*

■ The court finds that plaintiffs' constitutional challenge to USDB Reg. No. 28–1 is controlled by the recent decision in *Thornburgh v. Abbott,* — U.S. ——, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989). In that case, inmates in the custody of the Federal Bureau of Prisons challenged certain regulations which permitted prison officials to reject incoming mail which they determined to be a threat to institutional security. In discussing the standard for reviewing such regulations, the *Thornburgh* Court held that the proper inquiry is whether the regulation is "reasonably related to legitimate penological interests." *Id.* 109 S.Ct. at 1881 (citing *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987)). The *Thornburgh* Court identified several factors to be considered when inquiring into the reasonableness of a regulation concerning incoming mail at a prison facility. *Thornburgh,* 109 S.Ct. at 1882 (citing *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)).

First, the court must determine whether the governmental objective underlying the regulation at issue is legitimate and neutral and whether the regulation is rationally related to the objective. *Id.* After reviewing the regulation in the present case, this court is convinced that the USDB has a legitimate purpose in promulgating and enforcing Regulation No. 28–1. Like the regulation in *Thornburgh,* the present regulation is "expressly aimed at protecting prison security," an undeniably legitimate purpose. Also, the court finds that Regulation No. 28–1 operates in a neutral fashion, much like the regulation in *Thornburgh.* See *Thornburgh,* 109 S.Ct. at 1882–83 ("Where, as here, prison administrators draw distinctions between publications solely on the basis of their potential implications for prison security, the regulations are 'neutral' in the technical sense in which we meant and used that term in *Turner.*") Also, the court finds that Regulation No. 28–1 is rationally related to the legitimate interest of maintaining security in the disciplinary barracks. This regulation, which provides for an individualized determination of questionable incoming material through a multi-level review process, rationally serves the purpose of precluding the risk of disorder in the disciplinary barracks.

A second factor to consider in determining the reasonableness of a prison regula-

tion is "whether there are alternative means of exercising the right that remain open to prison inmates." *Id.* (quoting *Turner*, 482 U.S. at 90, 107 S.Ct. at 2262.) As long as the regulation permits a broad range of publications to be sent, received, and read, this factor is clearly satisfied. *Thornburgh*, 109 S.Ct. at 1884. The court finds that USDB Reg. No. 28–1 is narrow in its restrictions of publications. The evidence shows that USDB inmates are permitted to receive a broad range of publications.

A third factor to be addressed is the impact that accommodation of the asserted constitutional right will have on guards and other inmates in the disciplinary barracks. *Id.* Here, as in *Thornburgh*, the publications excluded under the regulation were considered potentially detrimental to the order and security of the disciplinary barracks. As the court said in *Thornburgh*, "[w]here, as here, the right in question 'can be exercised only at the cost of significantly less liberty and safety for everyone else, guards and other prisoners alike,' the courts should defer to the 'informed discretion of corrections officials.' " *Id.* (quoting *Turner*, 482 U.S. at 90, 107 S.Ct. at 2262). In this case, USDB officials determined that accommodation of plaintiffs' asserted right to receive the excluded publications may have a detrimental effect on prison security, potentially endangering guards and other inmates. No evidence has been presented to persuade the court not to defer to the informed discretion of the disciplinary barracks' officials on this matter.

Finally under the *Thornburgh* analysis, the court should consider whether there are easy alternatives to the regulation in question which would accommodate the prisoners' rights at *de minimis* cost to valid penological interests. *See id.* The court finds that plaintiffs have failed to establish the existence of any obvious, easy alternative to the challenged regulation. There has been no evidence produced at the trial or in the subsequent submissions to the court that would tend to characterize the regulation as an exaggerated response to legitimate penological concerns. For all of the foregoing reasons, the court finds

that Regulation No. 28–1 is constitutionally valid on its face under the standard enunciated in *Thornburgh*.

■ Given the facial validity of Regulation 28–1, the court must next determine whether the regulation as applied to the particular facts in this case is constitutionally adequate. The court finds that there has been no evidence presented that the USDB commandant rejected on a wholesale basis any particular type of publication arriving through the incoming mail. Instead, the evidence presented to the court shows that each rejection was based on reasons listed in the regulation.

The testimony of disciplinary barrack officials who have served on the LAB indicates that each publication was rejected only after an individualized determination that the rejected publication might encourage inmates to disrupt the security and order of the institution. Witnesses were able to point to particular portions in each publication which could legitimately raise concerns regarding the potential for racial or religious confrontations if the publications were allowed into the barracks. Thus, the court finds that the USDB officials made a conscientious review before deciding whether the material should be rejected. Accordingly, the court finds that the actions of USDB officials cannot be characterized as an exaggerated response to legitimate security concerns. Therefore, the court finds that the challenged regulation is constitutional as applied in this particular case.

### B. *Denial of the "European Heritage Club."*

■ Plaintiffs claim that the USDB's denial of their request to form a "European Heritage Club" for white inmates violates their right to equal protection. The court presumes that plaintiffs make such claim in the context of a possible due process violation under the Fifth Amendment of the United States Constitution. *See Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1953). Plaintiffs claim that their equal protection and due process rights were de-

**366**

nied because they were not allowed to form a group similar to that of the Afro–American Group and the Latin Studies Group.

Under applicable law, prison officials "need only demonstrate a rational basis for their distinction between organizational groups." *Jones v. North Carolina Prisoners Union,* 433 U.S. 119, 134, 97 S.Ct. 2532, 2542, 53 L.Ed.2d 629 (1976). Furthermore, any rights plaintiffs may be claiming under a first amendment right to association may give way to reasonable considerations of penal management. *Id.* at 132–33, 97 S.Ct. at 2541–43. The USDB has presented legitimate and rational reasons for denying plaintiffs' request to form the club. *See* Testimony of Colonel Smith. According to the presented evidence, the Afro–American Cultural Organization and the Latin Studies Group provide cultural support for certain inmates and assist in inmate rehabilitation and are beneficial to inmate mental health. The court defers to and agrees with Colonel Smith's conclusion that the European Heritage Group would not assist in any of these areas.

After considering the applicable legal standard and the evidence presented to the court, the court concludes that the United States Disciplinary Barracks' officials have not violated plaintiffs' rights of due process, equal protection or first amendment association by denying their request to form a "European Heritage Group." The court finds that USDB officials have presented a rational basis for not allowing formation of such group while allowing the existence of an Afro–American and Latin Studies Group. Thus, the court find that the denial of the request for an "European Heritage Group" was reasonable.

IT IS THEREFORE BY THE COURT ORDERED that the Clerk of the Court enter judgment in favor of defendants in this case. Plaintiffs are to take nothing.