Ahmad Abdul AZIZ, on behalf of himself
and all others similarly
situated, Plaintiffs,

v.

Eugene S. LeFEVRE, Superintendent of
Clinton Correctional Facility, and Ben-
jamin Ward, Commissioner of the New
York State Department of Correctional
Services, individually and in their offi-
cial capacity, Defendants.

No. 77–CV–193.

United States District Court,
N.D. New York.

Oct. 31, 1980.

Robert A. Kagan, Plattsburgh, N.Y., Su-
san N. Herman, New York City, David C.
Leven, Prisoners' Legal Service of New
York, Poughkeepsie, N.Y., for plaintiffs.

Robert Abrams, Atty. Gen. of the State
of New York, Albany, N.Y., for defendants;
James McSparron, Alan M. Adler, Asst. At-
tys. Gen., Albany, N.Y., of counsel.

JAMES T. FOLEY, District Judge.

MEMORANDUM–DECISION and ORDER

A motion for a preliminary injunction
filed in behalf of the plaintiffs was denied
after a court hearing and extensive briefing
by my memorandum–decision and order of
September 26, 1977. The memorandum–de-
cision was a substantial one of sixteen
pages, setting forth in detail the essential
findings of fact and applicable case law in
support of the conclusions of law. At that
time, the Prisoners' Legal Services of New
York also represented the plaintiffs, but the
attorneys were from its New York City
office, and the present attorneys are from
the Plattsburgh office. Since my Septem-
ber 26, 1977 decision, a Second Amended
Complaint was filed in the action on Sep-
tember 24, 1979, and there is now presented
after this interval of several years, a motion
by the defendants for summary judgment
as a matter of law dismissing the complaint,
and a cross–motion by the plaintiffs for
summary judgment granting the relief re-
quested in the Second Amended Complaint.
The motions for both sides state there is no
genuine issue as to any material fact, al-
though there is dispute as to the material
facts that should be accepted and con-
sidered to control the decision for grant of
summary judgment.

The Second Amended Complaint presents
the same dominant issue that was raised
with others now omitted, and was the one
discussed in detail in my previous decision.
The factual findings and legal conclusions,
and the reasoning therein, is incorporated
herein by reference. There has been addi-

tional discovery by the plaintiffs and an important deposition of 101 pages of Superintendent Eugene S. LeFevre that was taken at the Clinton Correctional Facility. The challenge still is, as it was previously to Directive No. 4203(a)(3)(a) (November 22, 1975) of the New York Correctional Services Department stating:

Inmates will be allowed to pray only in the privacy of their living quarters, during a religious service or in an area of the facility that has been designated for religious worship.

To this statewide directive, there is an implementing Rule 7.14 at Clinton Correctional Facility providing that "[t]here will be no religious services in the [prison exercise] yard or recreational area".

It is this directive and rule which has been enforced at Clinton to prohibit the plaintiffs Class, the Sunni Muslims, from performing Salat, their religious act of worship and ritual prayer in the prison recreational yard at Clinton that are challenged. There is no need to describe again this religious exercise as was done in my previous decision (p. 4) except to state for purposes of this summary judgment decision that it is a silent prayer accompanied by a series of physical movements which include bowing and prostration and the covering of the ground or floor with blankets and sheets which serve as a prayer rug for purification purposes. Superintendent LeFevre described it from his actual observation "... in a group, they kneel and bow and normally one inmate says the prayer aloud and others say it silently. Their eyes are moving and there is some movement of the body and the hands." (Deposition–Eugene LeFevre, p. 7, Jan. 25, 1980).

The position of the defendants to prohibit this exercise in the Clinton yard has been unchanged and steady throughout this litigation and is reiterated in support of their motion for summary judgment dismissing the complaint. It is urged that to allow this prayer of movement and prostration with the group selecting inmate Sunni Muslim guards to be posted around the religious exercise and the laying out of prayer rugs by groups in the open recreation yard, where usually 800 to 900 inmates are present at one time, would cause friction and physical confrontation among the inmates, and limit their common use of the yard for other recreational purposes. The further justification for the prohibition is that in no sense can it be deemed a "no–prayer" decree, because the Sunni Muslims are allowed as other religious sects to perform Salat individually in the privacy of their own cells, and in groups as other religious do in the areas of the prison established and designated for religious exercises, on Fridays and Saturdays, and for limited periods on the Feast days of their religion. (Deposition–LeFevre, pp. 10–19).

These privileges and accommodations to meet the rights to free religious exercise are discussed throughout this interesting and eyeopening deposition of Superintendent LeFevre in relation to these particular problems of prison life that most of us on the outside, including federal judges, are unfamiliar with. Superintendent LeFevre evidences continuous good faith effort on his part to be compatible with and have constructive understanding relationships with the diverse religious groups in the prison and provide areas within the prison for religious exercises as best can be done considering the necessary movement and supervision of religious groups in a large prison population of approximately 2500 prisoners that must be kept under continuous guard for security reasons. (Deposition–LeFevre, pp. 8–9, 20, 42–44, 48–52, 80–94). Superintendent LeFevre related his discussions with Islamic faith groups–the lack of space at Clinton to provide a permanent mosque for their religious exercises, and the plan in the Department being discussed to build an interfaith chapel for use of all faiths. (Deposition, pp. 94–100).

The Superintendent gives a vivid description of the Clinton yard, calling it the only yard of its type in the world, and describes in detail the activities that take place and that are allowed in the yard. He describes the unique courts that are allowed to inmate groups in which they can select their

own members, and sit in the open with each other, and read, talk, cook, and discuss politics. The groups are allowed to have religious books, engage in individual silent prayer, but are not allowed to preach or engage in organized religious activity. (Deposition–LeFevre–pp. 26–35, 56–60).

In *Wright v. McMann*, 321 F.Supp. 127 at p. 134 (NDNY 1970), 460 F.2d 126 (2d Cir.), *cert. denied*, 409 U.S. 885, 93 S.Ct. 115, 34 L.Ed.2d 141 (1972), I noted the description of Clinton, then commonly referred to as Dannemora, in Time Magazine, December 6, 1968 Issue, p. 33, in a review of My American Prisons, by Parisian Jacques Angelvin:

Dannemora: Scenically located on the Canadian border; cells resemble those at Sing Sing and are impeccably clean; siesta permitted between morning and afternoon work periods; ice skating, bobsledding and skiing available in season; clientele permitted to have their own gardens (Angelvin was allowed to raise his own potatoes so as not to have to eat frozen french fries); waiters in the dining room attired in white hats, jackets and gloves.

In my decision of September 26, 1977, my analysis, based upon the full hearing, and substantial submission of affidavits and exhibits, led me to the firm conclusion that the prohibition against organized and obvious group religious activity in the Clinton yard was justifiable and sensible. I said this:

It is a control decision that to my mind belongs solely for the determination of prison officials and officers familiar with the existing environment in their facility by reason of their day–to–day contact.

. . . . .

Defendants have demonstrated by the affidavits and testimony offered in their behalf that change in their "no prayer" policy may result in religious activity being undertaken by numerous and diverse groups in the prison exercise yard. . . . If the limited space of the yard was required to be made available for religious services, this would surely curtail the yard's use as a recreational area. Additionally, defendants' argument that in-

mates should not be forced to observe the dogmatic religious rituals of diverse religious groups during their limited opportunity to engage in outdoor recreational activity is sensible and persuasive.

It is very important to note that plaintiffs are not prevented from practicing their religious beliefs. (Memo–Decision and Order, September 26, 1977, NDNY, 77–CV–193, pp. 11–13).

■ That conviction is now strengthened by the submission on these summary judgment motions. The affidavit of Deputy Commissioner William G. Gard, in support of the plaintiffs' motion for summary judgment, and the enlightening deposition of Superintendent LeFevre again demonstrate that in the viewpoint of experienced correctional officials, familiar with the actual scene, the policy of prohibition of religious group activity is necessary to preserve internal order, discipline and security. The directive and rule challenged are plainly stated and confer by their terms the freedom to exercise prayer and group religious services in certain designated places, with prohibition in the Clinton recreational yard. In my judgment, the directive and rule are constitutionally acceptable and further one or more of the substantial governmental interests of security, order and rehabilitation. *Procunier v. Martinez*, 416 U.S. 396, 413, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224 (1974); *see also Trapnell v. Riggsby*, 622 F.2d 290 (7th Cir. 1980).

■ As the plaintiffs urge, there is no question that sentenced prisoners enjoy freedom of speech and religious rights under the First and Fourteenth Amendments. *Bell v. Wolfish*, 441 U.S. 520, 545, 99 S.Ct. 1861, 1876–1877, 60 L.Ed.2d 447 (1979); *see also Cruz v. Beto*, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); *see also LaReau v. MacDougall*, 473 F.2d 974 (2d Cir. 1972), *cert. den.*, 414 U.S. 878, 94 S.Ct. 49, 38 L.Ed.2d 123 (1973); *Burgin v. Henderson*, 536 F.2d 501, 504 (2d Cir. 1976). But, there is no complete prohibition of the opportunity to exercise this constitutional right in this instance. There must be as

emphasized an application of balance and judgment in the measurement and application of these rights in challenges of this kind to prison restrictions. *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). The case most cited for this balance is *Price v. Johnston*, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948), stating that lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights. Later, the Supreme Court cautions again that in a prison context an inmate does not retain those First Amendment rights that are "inconsistent with his status as a prisoner with the legitimate penological objectives of the corrections system." *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 129, 97 S.Ct. 2532, 2539–2540, 53 L.Ed.2d 629 (1977). The dramatic culmination of these cautionary instructions came in the reasoning and rulings in *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). The admonition is given again that the inquiry of federal courts into prison management must be limited to the issue of whether a particular system violates any prohibition in the constitution and that the wide range of "judgment calls" should be left to the prison administrators and not the courts. *Id.* at 562, 99 S.Ct. at 1886. It is also pointed out in *Wolfish*, p. 531, 99 S.Ct. at 1869–1870, the Second Circuit acknowledgment that "courts are ill–equipped to deal with the increasing urgent problems of prison administration." *See also Sostre v. McGinnis*, 442 F.2d 178, 191 (2d Cir. 1971, Ch. J. Kaufman).

The plaintiffs argue that the restrictions in the directive and rule that they call a "No–Prayer" rule is not the least restrictive means of furthering the security and recreational interests in the prison yard. It is suggested by their attorneys that the Sunni Muslim groups in the courts could be assigned away from the football field, that the posting of their own inmate guards could be prohibited, and if there were violations by disobeying orders the Sunni Muslim inmates could be punished directly. In my judgment, there are enough problems now existent in the state prisons without a

federal court directing and supervising enforcement action that undoubtedly could create more. Prison administrators are not required to show with certainty that adverse consequences will flow, and must be given latitude to anticipate consequences from their experience in the prison environment. *Procunier v. Martinez*, 416 U.S. 396, 413–414, 94 S.Ct. 1800, 1811–1812, 40 L.Ed.2d 224 (1974). It should be recognized that prison administrators do not have a quiet domain within which to experiment with such suggestions. As Justice Jackson remarked in *Douglas v. Jeannette*, 319 U.S. 157, 180, 63 S.Ct. 882, 888–889, 89 L.Ed. 1324:

> Can we give to one sect a privilege that we could not give to all, merely in the hope that most of them will not resort to it?"

Federal courts do not sit to supervise state prisons, the administration of which is of acute interest to the States. *Meachum v. Fano*, 427 U.S. 215, 229, 96 S.Ct. 2532, 2540, 49 L.Ed.2d 451 (1976).

Finally, concerning the test to be applied in the situation, whether it be compelling necessity or rational response, *Bell v. Wolfish*, 441 U.S. 520 at p. 547, 99 S.Ct. 1861 at p. 1878, 60 L.Ed.2d 447 renders the latest instruction:

> Accordingly, we have held that even when an institutional restriction infringes a specific constitutional guarantee, such as the First Amendment, the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security. *Jones v. North Carolina Prisoners' Labor Union*, 433 U.S. 119, at 129 [97 S.Ct. at 2540]; *Pell v. Procunier*, 417 U.S. 817 at 822, 826 [94 S.Ct. at 2804, 2806] (1974); *Procunier v. Martinez*, 416 U.S. 396 at 412–414 [94 S.Ct. at 1810–1812].

*See also Kahane v. Carlson*, 527 F.2d 492, 495 n. 6 (2d Cir. 1975).

In my judgment, the ban on organized group religious activity in the exercise yard was rationally related to the reasonable objectives of prison administration in the Clin-

ton Correctional Facility. *See Jones v. North Carolina Prisoners Labor Union*, 433 U.S. 119, 129, 97 S.Ct. 2532, 2539–2540, 53 L.Ed.2d 629 (1977). As I noted in my previous decision, an applicable standard in this situation would be that common sense often makes good law. *Peak v. United States*, 353 U.S. 43, 46, 77 S.Ct. 613, 615, 1 L.Ed.2d 631 (1957).

The New York State prison system is well financed and humanely administered and supervised. *See Frazier v. Ward*, 426 F.Supp. 1354 (NDNY 1977). The courts of New York are willing to entertain and decide 42 U.S.C. § 1983 actions involving the New York prison system, and its highest court–the Court of Appeals–does not hesitate to go beyond Federal Constitution protections when the State Constitution and laws provide greater rights. *Cooper v. Morin*, 49 N.Y.2d 69 at 79, 424 N.Y.S.2d 168, 399 N.E.2d 1188 (1979).

The motion of the defendants for summary judgment is granted and the Second Amended Complaint is dismissed. The cross–motion of the plaintiffs for summary judgment is denied and dismissed.

It is so ordered.