**Seymour X. COTTON, Jr., Plaintiff,**

v.

**A. L. LOCKHART, Superintendent of the Cummins Unit, Arkansas Department of Correction, Chris Monk, Assistant Superintendent of Treatment, Cummins Unit, Mr. Michael J. Hawke, Assistant Superintendent of Security, Cummins Unit, and Mr. Williams, Mail Room Supervisor, Cummins Unit, Defendants.**

**No. PB–C–77–33.**

United States District Court,
E. D. Arkansas,
Pine Bluff Division.

Sept. 18, 1979.

Seymour X. Cotton, Jr., pro se.

Darrell F. Brown, Asst. Atty. Gen., Little Rock, Ark., for defendants.

## MEMORANDUM OPINION

ROY, District Judge.

This action is before the court pursuant to the substantive provisions of 42 U.S.C. § 1983[1] and its procedural counterpart, 28 U.S.C. § 1343(3) & (4). The petitioner herein, Seymour X. Cotton, Jr., is an inmate and is currently confined at the Arkansas Department of Correction's Cummins Unit.[2] In this action the petitioner challenges, on First Amendment grounds, the constitutionality of the Department of Correction's so-called "publishers only" rule, a departmental policy which prohibits inmates in the Arkansas penal system from receiving by mail books, magazines and newspapers unless such items are sent directly from the publisher.[3] The defendants in this case are

---

1. 42 U.S.C. § 1983 provides as follows:

 "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

2. The Arkansas penal system consists of various "units" or physical facilities for the housing of inmates. The majority of prisoners are confined in either the Cummins Unit, the Tucker Unit or the Women's Unit in Pine Bluff, Arkansas. The Cummins Unit is a maximum security institution and, by far, is the largest penal institution both in terms of physical area and inmate population. The Cummins Unit houses males who have been convicted and sentenced to terms of imprisonment for felony offenses. The "East Building", a maximum security cell block located within the main compound at Cummins, houses inmates who have been administratively segregated, those who have been sentenced to punitive isolation for

breaches of prison rules characterized as "major disciplinaries" and inmates awaiting execution under a sentence of death. At the time of trial, plaintiff Cotton was confined in the "East Building".

3. The so-called "publishers only" rule has been the policy of the Arkansas Department of Correction for several years. The substance of the "publishers only" rule, which is located on page 49 of Court's Exhibit No. 1, is as follows:

 "You may receive magazines and newspapers through the mail but these items must be sent to you directly from the publishers. No magazines or newspapers may be received which advocate violence, racial discrimination, disturbances in the prison or which are pornographic. Books may be ordered direct by the inmate from the publisher; however, they must be paid for in advance and no book club memberships can be permitted. If you do not have sufficient money in your account to purchase books, U.S. Postal Money Orders with your prison number on them may be sent to your account so that you can order books. Because of the limited amount of space, it may be necessary for the Warden to place a limit on the num-

officials and employees of the Arkansas Department of Correction who are charged with the responsibility of enforcing the rules, regulations and policies promulgated or adopted by the Arkansas Board of Correction. This case, after being consolidated for trial with case number PB–C–77–67, *Seymour X. Cotton, Jr. v. A. L. Lockhart, et al.*, was tried before the court sitting without a jury on May 8, 1979. This opinion is submitted in lieu of separate findings of fact and conclusions of law as the court's memorandum of decision pursuant to the provisions of Rule 52(a) of the Federal Rules of Civil Procedure.

Plaintiff Cotton testified that the basis of his lawsuit in this case was the "publishers only" rule, a policy of the Arkansas Department of Correction which was in force at the Cummins Unit during 1976. He further testified that the rule prohibited him from receiving books directly from his home in Tucson, Arizona and that the operation of the "publishers only" rule limited his access to books because some books cannot be obtained from the publisher.[4] In support of his claim, the plaintiff testified that the publishers only rule had been abolished by a Mr. Jerry Campbell, a Department of Correction official, during 1975, ostensibly for the purpose of ending a federal court inquiry on the issue during the course of hearings which dealt with the constitutionality of conditions of confinement in the Arkansas penal system. Plaintiff Cotton further testified that defendant Monk reinstated the publishers only rule on orders

from defendant Lockhart who, at that time, was the Superintendent of the Cummins Unit. The plaintiff asserted that the rule allows him to send books home but precludes him from getting them back. Although the plaintiff has sent written complaints about the rule to the Superintendent of Cummins and the Director of the Department of Correction, he has not yet obtained any relief through pursuit of administrative remedies. Plaintiff Cotton, a follower of the Islamic faith, argues that the publishers only rule prohibits him from receiving religious books which are no longer handled by the publisher and, thus, impedes the exercise of his right to freedom of religion under the First Amendment.

Defendant Lockhart, who is presently employed as the Assistant Director for Institutional Services in Arkansas' Department of Correction, was the warden of the Cummins Unit during July of 1976. During the course of his testimony, Mr. Lockhart indicated that the publishers only rule could be repealed by the Board of Correction, the Director of the Department of Correction or by the courts. He further testified, however, in direct contradiction to the plaintiff's testimony, that the publishers only rule had never been repealed. He indicated that the publishers only rule was not an inflexible or "hard and fast" rule but, as with most rules or policies, was subject to exceptions. Religious literature was considered by him to be an exception to the general application of the publishers only rule.[5] Mr. Lockhart testified that the

---

ber of books which you are permitted to keep with your personal property. In this event, you may send the books home at your own expense after you have finished reading them or you may donate them to the institutional library. The amount of combustible material allowed will be regulated by policy issued by the Warden."

4. Under the facts of this case, our consideration of the validity of the publishers only rule is limited to the procurement of books. The plaintiff has not challenged, and hence we have no occasion to review, the application of the rule with regard to newspapers and magazines. Additionally, we must note that while the plaintiff testified at length, he did not indicate the title of a single religious book that he could no

longer procure from a publisher. Nor did the plaintiff suggest the title of any religious book which, if unavailable from a publishing company, could be procured from members of his family or friends.

5. Defendant Lockhart's testimony on this point is corroborated by the following statement in the Inmate's Handbook:

"Religious Activities

. . . Arrangements may be made through a staff chaplain for an inmate to obtain personal copies of books of religious content, or subscriptions to religious periodicals. The inmate may keep scriptural or devotional books consistent with his faith. All such books and publications are subject to the rules and regulations of the institution

wardens of the various units were authorized to grant exceptions to the publishers only rule and that he, while serving as warden of the Cummins Unit, had granted such exceptions to the plaintiff as well as other inmates.[6]

Defendant Lockhart justified the publishers only rule as a necessary security measure. He testified that the rule provided a workable method of controlling material coming into the institutions. He indicated that there was much less chance for drugs or contraband to come into an institution in a book sent directly from a publisher than if the book originated from some other source. He suggested that the rule had significantly facilitated the Department's ability to handle inmate mail since materials sent from a publisher require only a cursory examination whereas materials which are sent from sources other than publishers require a much more extensive examination or inspection. Defendant Lockhart testified that the rule had served its purpose. He further testified that inmates were notified when books were going to be returned for failure to obtain prior approval for their receipt from sources other than publishers and that inmates were given an opportunity to request an exception to the publishers only rule in such circumstances.

We disagree with the plaintiff's contention that the publishers only rule, as written or as applied, violates the plaintiff's First Amendment freedom of religion. We hold that the rule is a rational response to the Arkansas Department of Correction's legitimate interest in maintaining prison security. Accordingly, we find that the plaintiff has not been deprived of his First Amendment freedom of religion either by virtue of the existence of the publishers only rule or its operation.

The courts which have considered alleged constitutional deficiencies in publishers only rules have reached a variety of conclusions. In *Woods v. Daggett,* 541 F.2d 237, 240 (10th Cir. 1976), the Court sustained the publishers only rule at Leavenworth Penitentiary, a federal maximum security institution, despite allegations that the rule infringed upon the First Amendment rights of inmates. The court noted that the nature of the institution and its past history of problems with contraband entering the prison justified the rule. In another case which involved a constitutional challenge to the Texas Department of Correction's publishers only rule, *Guajardo v. Estelle,* 580 F.2d 748, 762 (5th Cir. 1978), the Court concluded that the rule did not deprive inmates of their right of access to the courts. A number of other courts have concluded that publishers only rules impermissibly restrict the reading material available to inmates. See *Wolfish v. Levi,* 573 F.2d 118, 129–130 (2nd Cir. 1978), reversed and remanded, *Bell v. Wolfish,* —— U.S. ——, —— - ——, 99 S.Ct. 1861, 1880–1882, 60 L.Ed.2d 447 (1979); *Cruz v. Hauck,* 515 F.2d 322, 333 (5th Cir. 1976), cert. den. sub nom., *Andrade v. Hauck,* 424 U.S. 917, 96 S.Ct. 1118, 47 L.Ed.2d 322 (1976); *Zaczek v. Hutto,* 448 F.Supp. 155 (W.D. Va.1978). We believe that most issues with regard to publishers only rules have now been resolved, however, by the United States Supreme Court's recent decision in *Bell v. Wolfish,* —— U.S. ——, —— - ——, 99 S.Ct. 1861, 1880–1882, 60 L.Ed.2d 447 (1979).

Although the Court's decision in *Bell, supra,* specifically dealt with conditions of confinement and practices in the Metropolitan Correctional Center, a federally operated short-term custodial facility in New York City designed primarily to house pretrial detainees, much of the decision applies

---

pertaining to articles and materials in the possession of or in the living quarters of the inmate." See page 39 of Court's Exhibit number one.

**6.** Plaintiff Cotton admitted during the course of cross-examination that he had been permitted to receive books directly from his family and friends. He testified that the last time he re-

ceived such permission was in 1976. It is not clear from the testimony when, if ever, he last requested an exception to the publishers only rule. Defendant Lockhart recalled approving a book sent directly to the plaintiff from a Ms. Moore of Tucson, Arizona, during 1976 while he was the warden of the Cummins Unit.

with equal force to convicted prisoners such as plaintiff Cotton. Before addressing the specific issue of the MCC's publishers only rule, the Court summarized its cases dealing with prisoner's rights in the following manner:

"Our cases have established several general principles that inform our evaluation of the constitutionality of the restrictions at issue. First, we have held that convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison. 'There is no iron curtain drawn between the Constitution and the prisons of this country.' So, for example, our cases have held that sentenced prisoners enjoy freedom of speech and religion under the First and Fourteenth Amendments, that they are protected against invidious discrimination on the basis of race under the Equal Protection Clause of the Fourteenth Amendment, and that they may claim the protection of the Due Process Clause to prevent additional deprivation of life, liberty or property without due process of law. *A fortiori*, pretrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights that we have held are enjoyed by convicted prisoners.

But our cases also have insisted on a second proposition: simply because prison inmates retain certain constitutional rights does not mean that these rights are not subject to restrictions and limitations. 'Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.' The fact of confinement as well as the legitimate goals and policies of the penal institution limit these retained constitutional rights.

There must be a 'mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application.' This principle applies equally to pretrial detainees and convicted prisoners. A detainee simply does not possess the full range of freedoms of an unincarcerated individual.

Third, maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees. 'Central to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves.' Prison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel and to prevent escape or unauthorized entry. Accordingly, we have held that even when an institutional restriction infringes a specific constitutional guarantee, such as the First Amendment, the practice must be evaluated in light of the central objective of prison administration, safeguarding institutional security." —— U.S. at ——, 99 S.Ct. at 1877–1878 (citations omitted)

Against this background of prior decisions the Court considered the constitutionality of MCC's publishers only rule, a rule which, at the time the Court considered it, prohibited MCC inmates from receiving hard back books by mail from sources other than a publisher, a book club or a bookstore. The Court concluded that the rule did not violate the First Amendment rights of MCC inmates and that the rule was a rational response by prison officials to "an obvious security problem".[7] *Id.* at p. ——, 99 S.Ct.

---

7. While the Court noted that the MCC had a security problem, the Court emphasized that prison administrators are not required to wait until a security problem develops before taking action. The District Court in *Bell, supra*, had rejected the publishers only rule as a valid security measure because the institution had "no record of untoward experience". In response to this finding the Court stated:

"We rejected this line of reasoning in *Jones v. North Carolina Prisoners' Labor Union, supra*, [433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629] at 132–133, where we stated, 'Responsible prison officials must be permitted to take reasonable steps to forestall . . threat[s to security], and they must be permitted to act before the time when they can compile a dossier on the eve of a riot.' We

1880. The Court's ultimate conclusion was influenced by the following factors: (1) hard back books were easily adapted for smuggling contraband into an institution since money, drugs and weapons could be hidden in the bindings and the books were difficult to search; (2) the rule operated in a neutral fashion, without regard to the content of the expression; (3) alternative means of obtaining reading materials were not shown to be burdensome or insufficient; (4) exceptions to the publishers only rule permitted entry of certain kinds of reading materials; (5) the inmate library provided a relatively large source of reading materials; and (6) the impact of the rule was minimal and, in most cases, would apply to MCC inmates for not more than approximately sixty (60) days. The Court concluded its consideration of MCC's publishers only rule by observing that the rule was reasonable in time, manner and place and that the rule furthered significant governmental interests. *Id.* at p. ——, 99 S.Ct. 1880, 1881.

The Arkansas Department of Correction's publishers only rule is somewhat broader than the MCC's rule inasmuch as the former rule, for purposes of this case, makes no distinctions between hard and soft back books. We do not, however, perceive this difference in scope as constitutionally defective.[8] While hard back books may pose a greater potential security threat, most of the illegal activity which could be accomplished through the use of hard back books could likewise be facilitated through the use of soft back books. For example, the concealment of a "paper of heroin" could be done in a soft back book as easily as in a hard back book. Besides the difference in scope, there are other significant differences between the Arkansas Department of Correction's publishers only rule and the MCC rule. The Department of Correction's rule, unlike the MCC rule, applies to *persons who have been convicted* of felonies. Thus, the presumption of innocence is simply not a factor under any theory. Additionally, the rule, at least in the plaintiff's case, is being applied in a maximum security institution which is more analagous to Leavenworth Penitentiary than to the Metropolitan Correctional Center. Furthermore, the impact of the Department of Correction's rule is much more likely to exceed, in any given case, the impact of the MCC's rule since the duration of the impact will by controlled by the inmate's sentence as opposed to a relatively small period of time prior to an MCC inmate's trial.

Despite differences between the MCC publishers only rule and the Arkansas Department of Correction's rule, there are sufficient similarities between the two and the manner in which they operate to sustain the latter. As is the case with the MCC publishers only rule, the Department of Correction's rule operates in a neutral fashion. The rule's prohibition relates to source rather than content of expression. Secondly, Department of Correction inmates have available an alternative means of obtaining religious materials, an alternative which the plaintiff failed to show was burdensome or that he had even utilized.[9] Thirdly, we take notice, as a matter of adjudicated fact, that inmates at the Department of Correction's Cummins Unit have access to a varie-

---

reject it again, now. In *Jones*, we also emphasized that the 'informed discretion of prison officials that there is a potential danger may be sufficient for limiting rights even though this showing might be "unimpressive if . . . submitted as justification for governmental restriction of personal communication among members of the general public." ' " *Id.* at p. ——, n. 32, 99 S.Ct. at p. 1880 n. 32. (citations omitted)
Defendant Lockhart's inability to recall any incident where contraband was found in a book sent through the mail does not, therefore, necessarily vitiate the underlying justification for the rule. Furthermore, the absence of contra-

band could as easily support an inference that the publishers only rule has been an effective deterrent to the entry of contraband as it could an inference, suggested by the plaintiff, that the rule is unnecessary.

**8.** The Court did not consider those portions of the MCC's publishers only rule that dealt with magazines and soft-cover books in its decision in *Bell v. Wolfish, supra. Id.* at p. ——, n. 31, 99 S.Ct. at p. 1880.

**9.** The Department of Correction's Inmate Handbook provides a specific mechanism for obtaining religious books. See note 5, *supra.*

ty of reading materials through the institutional library. Lastly, the potential impact of the rule with respect to the First Amendment freedoms of inmates has been greatly ameliorated by the granting of exceptions to the general application of the rule, exceptions which, admittedly, have been extended to the plaintiff.

Under the circumstances presented, we must conclude that the plaintiff has suffered no deprivation of his First Amendment rights as a result of the existence or application of the Arkansas Department of Correction's publishers only rule. We find the rule a reasonable and constitutional response to the Department's substantial and legitimate concern for the maintenance of institutional security.