**Vernon RICH on behalf of himself and all others similarly situated, Plaintiff,**

v.

**D. G. LUTHER, Superintendent of the Union County Unit of the North Carolina Division of Prisons; David Jones, Secretary of the North Carolina Department of Correction; and Ralph Edwards, Director of the Division of Prisons of the North Carolina Department of Correction, Defendants.**

Civ. A. No. C–C–75–365.

United States District Court,
W. D. North Carolina,
Charlotte Division.

May 15, 1981.

Norman B. Smith, Smith, Patterson, Follin, Curtis, James & Harkavy, Greensboro, N. C., for plaintiff.

Jacob L. Safron, Sp. Deputy Atty. Gen., North Carolina Dept. of Justice, Raleigh, N. C., for defendants.

Before RUSSELL, Circuit Judge, JONES, Chief District Judge, and McMILLAN, District Judge.

OPINION and ORDER

DONALD RUSSELL, District Judge.

Vernon Rich, a prisoner confined in a North Carolina state prison, filed suit pur-

---

suant to 42 U.S.C. § 1983, in December 1975, on behalf of himself and other prisoners within that State's prison system seeking to have certain orders issued by the State of North Carolina in accordance with state law, forbidding inmates from receiving books, magazines and newspapers not sent directly from the publisher, declared unconstitutional as being in violation of his First Amendment rights.[1] Since the action was commenced before the 1976 Amendment, the resolution of the constitutional issue presented required the convening of a three-judge court. 28 U.S.C. § 2284.

The regulation challenged in this case is found in Title 5, N.C. Administrative Code, Chapter Subchapter 2D, [hereafter, 5 N.C. A.C. 2D]. Specifically, plaintiff challenges 5 N.C.A.C. 2D.0101(a), which in relevant part reads:

> An inmate in medium, close, or maximum security may receive a reasonable number of books, newspapers, magazines, and other publications directly from the publisher. An inmate in minimum custody may receive publications from any source subject to the standard search for contraband. Inmates ordering publications must forward their payment for subscriptions or individual publications with their orders; inmates shall not receive publications of any kind on a trial basis with payment postponed. Additional publications may be donated to the unit or institution by community organizations or other interested persons in the community. The number of publications received by individual inmates, however, may be reasonably limited to prevent overcrowding and possible fire hazards. All material submitted for delivery is subject to a search for contraband.

Plaintiff Vernon Rich was sent two books, GREAT SHORT WORKS OF MARK TWAIN and DON JUAN: A YAQUI WAY OF KNOWLEDGE, from a woman in Durham, North Carolina. The books were returned to her by prison officials. It is the refusal by the prison officials, in accordance with the publisher only rule, as set forth in 2D 0101(a), to allow Rich to have the two books that plaintiff presently challenges as having been a denial of his First Amendment rights under the Constitution of the United States.[2]

The sole issue before this court is the applicability of *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) to this case.[3] The Supreme Court in *Wolfish* considered a constitutional challenge to a publisher only rule in operation in a correctional institution in New York City.[4] The facility, in that case, was designed primarily to house pretrial detainees. The Supreme Court held that a publisher only rule does not violate the First Amendment rights of pretrial detainees. *Id.* at 550, 99 S.Ct. at 1880.

The essential distinguishing factor under consideration by this court is whether the holding in *Wolfish* with respect to the publisher only rule applies to persons convicted, sentenced and confined to a state prison as well as to prison detainees. We hold that it can and does.

Justice Rehnquist, writing for a plurality of the Court in *Wolfish*, observed that "maintaining institutional security and preserving order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of ... [convicted prisoners] ...." *Id.* at 546, 99 S.Ct. at 1878.[5] He went on to say:

**1.** This regulation shall hereinafter be referred to as the "publisher only rule."

**2.** It must be noted that Rich does not claim that he required these two books in furtherance of preparation for litigation, thereby invoking support from other provisions of the Constitution. His claim is grounded solely on an assertion of a right to receive the two books.

**3.** [Hereinafter " *Wolfish* " ]. *Wolfish* was decided after this case was filed.

**4.** The constitutional challenge to the publisher only rule in *Wolfish* was also under the First Amendment.

**5.** *See also, Jones v. North Carolina Prisoners' Labor Union*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977); *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974).

"Prison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* at 547, 99 S.Ct. at 1878.[6] We are convinced that the restrictions limiting receipt of books, magazines and newspapers from publishers only in a prison, which contains persons convicted of crimes, who do not possess the presumption of innocence that pretrial detainees do, is also a rational and reasonable response to security problems confronting state officials charged with the responsibility of managing the North Carolina prison system.

The Fourth Circuit recently considered a challenge to the publisher only rule in the Virginia prison system by one in a similar status to that of the plaintiff. *Zaczek v. Hutto*, 642 F.2d 74 (1981). It was recognized in that case that the constitutional validity of a publisher only regulation as declared in *Wolfish* applied to persons convicted and sentenced to prison as well as to pretrial detainees.

Earlier a federal district court in Arkansas had reached a like conclusion in a challenge by a convicted prisoner to a publisher only regulation of the prison system. *Cotton v. Lockhart*, 476 F.Supp. 956, 957 (D.Ark.1979), *aff'd*, 620 F.2d 670 (8th Cir. 1980). The rule, in that case, pertained to books, magazines and newspapers. That court, however, limited its opinion to the procurement of books only. *Id.* at 958, n.4. The court held that the rule did not violate the prisoner-plaintiff's First Amendment rights, thereby sustaining the validity of the rule. The court said, "simply because prison inmates retain certain constitutional rights does not mean that these rights are not subject to restrictions and limitations." *Id.* at 960.

The district court in *Cotton*, as characterized later by the Eighth Circuit on review, determined that "(1) the rule operates in a neutral fashion regulating source rather than content of expression; (2) receipt of soft cover as well as hard cover books poses a substantial security problem ... (4) inmates have access to reading materials through the prison library, ..." 620 F.2d at 672. These findings are equally operative in the instant case and assisted the court in arriving at its conclusion.

In the instant case, prison officials, through their affidavits and depositions, demonstrated to the satisfaction of the court that the publisher only rule, as it exists in North Carolina, was promulgated to further a function of security within the state's prison system. Concern exists about the need to prevent the flow of drugs and weapons into prisons in North Carolina. The rule is, we believe, a rational response to a well recognized problem. It constitutes a valid state objective carried out in a not unconstitutionally restrictive manner. Therefore, we do not feel constrained in finding that the holding of the Supreme Court in *Wolfish*, with respect to the publisher only rule, is applicable to this case, where prison officials use the rule in dealing with persons convicted of crimes and sentenced to the North Carolina state prison system.

Accordingly the plaintiff is not entitled to the relief he seeks and the complaint is dismissed, and

IT IS SO ORDERED.

McMILLAN, District Judge, dissenting:

I respectfully dissent.

The majority would take bad law (the "publishers only" decision in *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), cautiously announced by a badly divided court, and limited to a narrow situation), and would extend it into new territory. They cite *Zaczek v. Hutto*, 642 F.2d 74 (4th Cir. 1981), which is not binding on this court, and *which did not decide the question at all*, but merely accepted the appellant's erroneous *concession* that the case was controlled by *Wolfish*. The majority do not in

---

6. *Jones*, 433 U.S. at 128, 97 S.Ct. at 2539; *Procunier v. Martinez*, 416 U.S. 396, 404–405, 94 S.Ct. 1800, 1807–1808, 40 L.Ed.2d 224 (1973).

their opinion recognize the numerous ways in which this case differs in significant fact from *Wolfish* and in which the result they reach far outdoes *Wolfish* in unjustified and apparently inadvertent repressiveness. I am unable to concur.

*Bell v. Wolfish* was tried on a skimpy record; this case was tried on a fully developed record, in which all the premises accepted by a slender majority of the *Wolfish* court were sharply repudiated by strong testimony. That fact makes a difference to me.

Wolfish and his fellow litigants were *short*-term prisoners; they were inmates at a New York City detention center which ordinarily housed only pre-trial detainees and persons awaiting sentencing; more than half of the inmates were kept there *less than ten days*, while sixty days was about the maximum duration for anyone. The *Wolfish* court said that

"... *we are also influenced in our decision* by the fact that the rule's impact on pretrial detainees is limited to a *maximum* period of approximately sixty days." 441 U.S. at 552, 99 S.Ct. at 1881 (emphasis added).

*Wolfish* also relied on the short duration of stay in the New York institution to uphold its challenged "double bunking" practice (requiring an inmate to share toilet facilities and a small sleeping space with another person). By contrast, plaintiff in this case and the class he represents are all the persons serving active sentences in institutions of the North Carolina Department of Correction. Their sentences range from a few months to life imprisonment. Those facts make a difference to me.

The rule of *Wolfish* was limited to hardback books, and it allowed such books to be received from book stores and book clubs as well as from publishers. By contrast, the North Carolina rule under attack applies to *all* books and magazines, and makes no distinction between hard cover and soft cover publications. In the majority opinion in *Wolfish*, Justice Rehnquist carefully pointed out that when the case was before the Court of Appeals, which affirmed the District Court's injunction against enforcement of the rule, it applied to *all* books and magazines. 441 U.S. at 549, 99 S.Ct. at 1879. Before the case was argued in the Supreme Court, however, the rule was amended to permit inmates to receive books and magazines from book stores as well as from publishers and book clubs and, at the time of the Supreme Court decision, there was an amendment under consideration which would allow *soft* cover materials to be received from *any* source. Those facts make a difference to me.

Wolfish and his fellows had additional means of obtaining reading materials. Among the sources specifically mentioned in the majority opinion of Rehnquist were: (1) Soft bound books and magazines could be received from any source, and hard back books could be received from book stores and book clubs as well as from publishers. North Carolina permits prisoners to receive no publications except from the publisher. (2) The New York prison offered for sale to inmates four daily newspapers and certain magazines, 441 U.S. 551, 552, 99 S.Ct. 1880, 1881. No comparable availability of newspapers and magazines in North Carolina prisons is shown. (3) The single New York City facility involved in *Wolfish* had a prison library containing over *eight thousand* volumes! North Carolina offers no such wealth of access to information in its various prisons. Those facts make a difference to me.

*Wolfish* was pointedly restricted to its own facts, with caution against unwarranted extension to other fact situations. The Supreme Court's statement, at 441 U.S. 552, 99 S.Ct. 1881, was that

in sum, considering all the circumstances, we view the rule, *as we now find it*, to be a "reasonable 'time, place and manner' regulation that is necessary to further significant governmental interests ...." [Citations omitted, emphasis supplied.]

The Supreme Court's warning limitation on its own decision makes a difference to me.

In *Wolfish* there was "*simply no evidence* in the record to indicate that MCC officials have exaggerated their response to this se-

curity problem and to the administrative difficulties posed by the necessity of carefully inspecting each book mailed from unidentified sources. *Therefore*, the considered judgment of these experts must control in the absence of prohibitions far more sweeping than those involved here." 441 U.S. at 551, 99 S.Ct. at 1880 (emphasis added). By contrast, the weight of the evidence before us shows that the "publishers only" rule can not be justified by "security risks." And this panel is faced with a situation in which the prohibitions are indeed "far more sweeping."

The strong showing by the plaintiff's witnesses is that:

(a) Abrogation of the rule would *not* increase security problems. In the absence of such a rule, the actual experience has been that security problems are minimal. In fact, North Carolina has no security problems in the minimum custody units, where the rule does not apply.

(b) The main sources of contraband in prisons in descending order of frequency and importance are: (1) the institution itself with its kitchens, supply rooms, equipment and work and educational facilities; (2) a small number of corrupt, naive or opportunistic employees, delivery people or tradespeople who have access to the institutions; (3) inmates who are admitted or discharged or pass in and out as trustees, on work detail or on their way to and from court; (4) visitors; and (5) letter and package mail that is inadequately inspected. The reading materials which the rule prohibits are thus only a *portion* of the *fifth* most frequent source of contraband.

(c) A diligent inspection of an average book or magazine should take less than thirty seconds. Weapons and escape devices can be easily detected. Other implements which may not be so easily detected are readily available in the prison environment.

(d) An avowed *original purpose of the "publishers only" rule was to censor and control the content of prisoners' reading material* and *not* to control the introduction of contraband.

(e) There is no evidence and no reason to believe that employees of publishers are any more honest than employees of book stores, libraries and other distributors.

(f) Substantial quantities of drugs and money are already a problem in North Carolina prisons. These problems cannot be entirely eliminated without employing inhumane security measures.

Defendants' experts did not have any evidence of actual *experience* to the contrary. Defendants' claims are mainly assertions of economic and administrative inconvenience in searching for contraband in publications. Most of the supposed increased risk in security could be obviated by adequate inspection techniques. If the mass mailings they fear actually resulted from abolishing the rule, they could limit the number of mailings each prisoner could receive.

The great weight of the evidence in this case that the rule is not justified on "security" grounds makes a difference to me.

*Wolfish* reiterated the principle enunciated in *Wolff v. McDonnell*, 418 U.S. 539, 556, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935, that there must be a "mutual accommodation between institutional needs and objectives and *the provisions of the Constitution* that are of general application." 441 at 546, 99 S.Ct. at 1877 (emphasis added). *Wolfish* does *not* support a conclusion that a broad "publishers only" rule in any prison setting should be upheld as constitutional. The First Amendment rights of North Carolina prisoners outweigh the minimal security risks which might result from partial or even total abrogation of the "publishers only" rule. The restriction against all publications from any source other than publishers is an over-reaction by prison officials to potential security problems. The rule cannot be sustained as a *reasonable* time, place and manner regulation that is *necessary* to further a significant governmental interest. Though the government and all we citizens have a significant interest in the security of the prison system, and though restrictions and regulations are essential to

maintaining a secure prison, the rule the majority is upholding today is unreasonably broad in scope and unconstitutionally infringes the First Amendment rights of North Carolina prisoners.

I cannot help musing on the advertised purposes of imprisoning people who have been convicted of crimes. The literature abounds with articles discussing the goals of retribution versus punishment versus rehabilitation versus protection of society. The prison department is titled the North Carolina "Department of *Correction.*" If "correction" includes rehabilitating persons to live non-violent and non-criminal lives, then the "publishers only" rule runs totally counter to that goal.

One of the numerous epigrams which Pansy Howell (mother of Ida Friday, wife of Bill Friday, President of the University of North Carolina) taught my tenth grade English class at Lumberton High School in 1930 was that "Books are the windows through which the soul looks out." Rehabilitation, or correction, or retribution, may require imprisonment of the body; but *is it also necessary, without demonstrated reason, to black out the windows of the soul*? Prisoners as a group are impoverished; they can't afford to pay publishers' prices like $12.95 or $29.50 for new books from publishers when cheaper sources are available. The two books which were mailed to the plaintiff and were returned to the sender by prison officials were *Great Short Works of Mark Twain* and *The Teachings of Don Juan: a Yacqui Way of Knowledge.* The meager listing of books available through the prison system library does not include these titles nor the titles of many books through which prisoners, with nothing but time on their hands, can become motivated to complete their education or to learn a skill, or through which they can be provided with positive, non-debilitating prison experiences.

Breaking the cycles of poverty, ignorance, criminal behavior and recidivism is hard enough if it is done in an enlightened way. Protecting prisoners' First Amendment rights is mandatory if we are going to approach the task humanely and with any hope of success.

I respectfully, but emphatically, dissent.