**Richard M. WAGNER, Plaintiff,**

v.

**Carl THOMAS, et al., Defendants.**

**No. CA 3–81–0075–R.**

United States District Court,
N.D. Texas,
Dallas Division.

May 8, 1985.

Tom S. Leatherbury, Locke, Purnell, Boren, Laney and Neely, Dallas, Tex., for plaintiff.

Peter Harlan and J. Steven Bush, Asst. Dist. Attys., Frank Betancourt, DeHay & Blanchard, Dallas, Tex., for defendants.

## MEMORANDUM OPINION

BUCHMEYER, District Judge.

This is a suit brought under 42 U.S.C. § 1983 by a former inmate of the Dallas County Jail. It involves *dirty books* and *dirty looks.*

As to *dirty books,* the plaintiff claims that his constitutional rights were violated because the jail officials would not permit him to look at pictures of nude females in a magazine, *Easyriders* ("Entertainment for Adult Bikers"). As to *dirty looks,* the plaintiff claims that his constitutional rights were violated because female deputies could see *his* nude body during a random "strip search" of all inmates in his tank.

The case was fully tried.[1] The evidence establishes that the plaintiff's claims are baseless. Accordingly, for the following reasons, the case is dismissed with prejudice.[2]

### 1. FACTUAL BACKGROUND

The plaintiff, Richard Wagner, was convicted of a felony, the unauthorized use of a motor vehicle. On March 7, 1980, he was sentenced to serve 2–4 years in the Texas Department of Corrections. However, while his criminal case was on appeal, Wagner remained in the Dallas County Jail—and was there at all times relevant to this suit.[3]

---

1. *Tom Leatherbury,* a former law clerk to one of the judges in this division, volunteered to represent the plaintiff. He did an outstanding job in preparation, briefing, trial, and representing his client. His excellent service in this case—for which he received no money—is in the highest tradition of the legal profession.

2. This opinion constitutes the Court's findings of fact and conclusions of law. Fed.R.Civ.P. 52(a).

3. Wagner was not a stranger to the Dallas County Jail. He was also there in 1980 (illegal possession of marijuana), and in 1979 (unlawfully carrying a weapon), and in 1977 (burglaries of a building and a vehicle), and in 1976 (illegal possession of marijuana).

The defendants include Dallas County, two past sheriffs of Dallas County (Carl Thomas, Don Byrd), and several other employees of the Sheriff's Department who were involved in the administration and the day-to-day operation of the Dallas County Jail.

### a. Dirty Books

The Dallas County Jail has a "publisher-only" rule, which also regulates the contents of books and magazines that an inmate may receive. It provides:

"Inmates may receive pre-paid subscription magazines and books that do not depict nudity, pander to sexual interest, advocate racial prejudice or present a security threat to the jail.

"a. Inmates should consult the Jail Commander prior to subscribing to a magazine or book in order to determine the acceptability of a particular publication.

"b. All magazines and books must be received directly from the publisher or authorized distributor." [4]

The plaintiff Wagner was aware of this jail regulation. However, at his request, Wagner's mother sent him a copy of the February 1982 issue of *Easyriders* ("Entertainment for Adult Bikers") by certified mail, return receipt requested. On the cover of this issue (Pl.Exh. 9), there was a

picture of part of the body of an attractive female, wearing only cut-offs which were scanty and open at the top. On pages 54–59, there was a four-page "spread" of mostly nude pictures of this same female, showing her naked breasts, her buttocks, her genitals (one picture only), and her tatoo (five pictures). On pages 72–73, there was a regular monthly feature, the *"Ol' Lady Contest,"* which contained amateur photos of ten different females; some of these females were clothed, but there were four with naked breasts, one with genitals exposed, and another with naked breasts and an even more impressive and prominently displayed tatoo than that of the cover girl. The rest of the 130-page issue was devoted to other material presumably of interest to "bikers." [5]

Jail officials refused to permit Wagner to have this copy of *Easyriders* because it was not "received directly from the publisher or authorized distributor"—and because they deemed it detrimental to jail security because it contained pictures of nude females.[6] Wagner claims that this violated his rights under the First Amendment, and he seeks $2,500 in damages.[7]

### b. Dirty Looks

The Dallas County Jail has a rule concerning the five types of searches—"pat

---

**4.** Jail Policy No. 211.80.41(IV)(A)(7).

**5.** With the exception of two ads (pages 108 and 117), there are no other nude pictures of females in the February 1982 *Easyriders*. And, in all fairness, one of these should probably not count, since it appears to be a group shot of the *Easyriders* staff (male tatoos only).

**6.** Jail officials would not permit inmates to receive *Playboy, Penthouse, Hustler* or *Oui* even if they complied with the "publisher-only" rule. (Pl.Exh. 32.) However, they were not sure about *Rolling Stone* and *National Enquirer* because they were "not familiar with [these] periodicals." (*Id.*) The record is silent concerning how the jail officials would deal with the annual swimsuit issue of *Sports Illustrated.*

**7.** One should be candid. Although the February 1982 issue of *Easyriders* did contain six pages of nude photographs of females, it does not even begin to compare to the sleaze and unmitigated raunch of "hard-core skin magazines" like *Hust-*

ler. (See this Court's opinion in *Faloona v. Hustler Magazine, Inc.*, 607 F.Supp. 1341). Indeed, were this issue to be reviewed by *Joe Bob Briggs*, the former Drive-In Movie Critic of the Dallas Times Herald, it could only be unfavorable: "Extremely disappointing garbonza count: 25½. No blood. No beasts. No Kung Fu. Four biker chases. Biker fiction, biker cartoons, biker letters, biker horoscopes, biker suspenders. Four wasted pages of fully-clothed bimbos. But over 75 tatoos (including one guy with "Harley Davidson" on the inside of his lower lip). Meaningful review of Russ Meyer biker flick classic ("Motor Psycho," starring Haji and her two enormous talents as the "Ol' Lady"). Drive-in Academy Award nomination to bimbo with tatoo covering one entire ... if you know what I mean, and I know that you do. One-half star. Joe Bob says don't monkey with the High Sheriff—and get out before you check it out."

search, frisk search, strip search, body cavity search, and electronic scan search"—that it conducts with respect to the inmates.[8] The portions dealing with strip searches provide:

"STRIP SEARCH: The inmate is instructed to remove all clothing and the deputy makes a visual inspection of all parts of the body. This included a visual inspection of the exterior portions of body cavities, but does not involve touching or extracting contraband from body cavities.

.    .    .    .    .

"Inmates may be subject to a strip search during the following occasions:

"a. Immediately upon being received at the male or female Clothing Room during the initial admission process;

"b. Upon returning to any jail facility from an area outside the jail's security perimeter;

"c. During the course of a regular search/inspection of inmate housing units by Detentions Bureau personnel;

"d. At any time a jail employee has reasonable cause to suspect that contraband could be possessed by an inmate."

On December 9, 1980, Wagner was being held in Tank 4–L–2. On that day, Deputy Selvy conducted a random, unannounced "strip search" of all the inmates in this tank.[9] Seven deputies, including one woman (Deputy Dennis), participated in this strip search. The inmates were taken out of the individual cells, placed in a line, and then strip-searched in the presence of each other. *Before the first inmate took off his clothes, the female deputy (Dennis)—in accordance with jail policy* [10]*—left the tank.* [11] During this search, many items of "contraband" [12] were found and seized, although no contraband was found on Wagner or in any body cavities of the inmates.[13]

On August 24, 1981, Wagner was being kept in Tank 12–S–15. On that day, Deputy Sawyer (a female) received information that there was a knife in this tank.[14] She ordered a "strip search" of the inmates in Tank 12–S–15. Three of the deputies who participated in this search were females (Sawyer, Tucker and Stubbs). However, Tucker was not even present during the strip search; and, before the first inmate was ordered to disrobe, Deputies Sawyer and Stubbs left and were in the "safety vestibule" by the exterior door to the tank. (See Def.Exhs. 16–31.) Neither of these female deputies looked at the male inmates while they were being strip-searched; indeed, two banks of bars set at a right angle to each other obscured their view into the area where the strip search was taking

8. Jail Policy No. 211.81.61.

9. Although Selvy chose Tank 4–L–2 at random, he testified that there had been a particular problem with the inmates in that tank making weapons from stolen educational supplies (carving knives, paint brushes, etc.).

10. "In compliance with Section 217.09.016 of the Texas Commission on Jail Standards and policy of the Dallas County Sheriff's Department, *only female deputies shall conduct strip searches of female inmates and only male deputies shall conduct strip searches of male inmates.*"

11. This fact was disputed at trial. The Court discredits the plaintiff's testimony, and credits that of the deputies who conducted the search. Although Dennis was still in the tank when the first inmate was ordered to disrobe, Deputy Selvy discovered this—and stopped the strip

search until Dennis was completely out of sight of the male inmates.

12. The Jail Policy concerning searches (footnote 8) describes contraband as "Anything that is illegal in and of itself, such as narcotics or weapons, and anything that is not specifically allowed to be possessed by inmates in accordance with policy established by the jail administration. This would include items of clothing, food stores, money, self-fashioned weapons."

13. Jail inmates found with contraband are subject to punishment. The evidence established that inmates often avoid secreting contraband on their persons or in their body cavities for fear that deputies will find it in a random strip search.

14. She was told this by Deputy Van Note, who had been given this tip by a jail inmate.

place.[15] Again, during this search, many items of contraband were found and seized,[16] although no contraband was found on Wagner.

Wagner was not touched by any deputy during either strip search; nor was he treated any differently than any other inmate during the search.[17] However, Wagner is offended because he was nude—and could have been seen by the other inmates, or the deputies who conducted the strip search. Consequently, Wagner claims that the searches were unreasonable and violated the Fourth Amendment; specifically:

> "Wagner contends that the searches were unreasonable because they were conducted upon an inadequate showing of cause and because of the manner in which they were performed. Wagner claims it is unreasonable for a strip search and a body cavity inspection of the genital and the rectal areas to be performed in the presence of numerous deputy sheriffs and inmates and in such a fashion so that Wagner could see female deputy sheriffs such as Tucker and Sawyer during the course of the search."

Wagner also contends that the strip searches constituted cruel and unusual punishment under the Fourteenth and Eighth Amendments to the Constitution, and violated his right of privacy under the First Amendment. For these alleged violations, he seeks $7,500 in damages.

**15.** This fact was disputed at trial. The Court credits the testimony of the deputies who participated in the search and Deputies Sawyer and Stubbs, who testified that they did not observe the strip search. The Court discounts the testimony of the plaintiff, that he could clearly see Sawyer and Stubbs during the strip search, because the plaintiff lied.

**16.** Deputy Selvy testified that he could never remember a strip search when contraband was not found—and that weapons were located "fairly often."

**17.** The evidence established that strip searches and body cavity inspections are extremely unpleasant and degrading, as are many things in jails and prisons, but that they are just as distasteful to deputies as to inmates. Deputies must carefully examine each inmate's mouth, ears, armpits, genitals and buttocks—because attempts to conceal money, drugs, weapons

## 2. THE CONTROLLING PRINCIPLES

This case is controlled by the principles established in *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)—and in two subsequent Supreme Court decisions following that opinion: *Hudson v. Palmer*, — U.S. —, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984); and *Block v. Rutherford*, — U.S. —, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984).

### a. *General*

Prisons and jails "are not beyond the reach of the Constitution." *Hudson*, — U.S. at —, 104 S.Ct. at 3198. Therefore, both convicted prisoners and pretrial detainees must be accorded "those rights not fundamentally inconsistent with imprisonment itself or incompatible with the objectives of incarceration."[18] *Id.* at —, 104 S.Ct. at 3198. However, simply because prison or jail inmates retain certain constitutional rights "does not mean that these rights are not subject to restrictions and limitations." *Bell v. Wolfish*, 441 U.S. at 545, 99 S.Ct. at 1877.

Indeed, "maintaining institutional security and preserving internal order and discipline" are *essential* goals that may require the limitation of some of the constitutional rights of "both convicted prisoner and pretrial detainees."[19] *Bell v. Wolfish* emphasizes:

(e.g., folding knives), and other contraband in these body cavities is common. See *Bell v. Wolfish*, 441 U.S. 520, at 559, 99 S.Ct. 1861, at 1884, 60 L.Ed.2d 447 (1979). However, strip searches would not be as degrading and dangerous as other alternatives, such as having deputies feel the genital areas of clothed inmates. *Id.* at 559–60, note 40, 99 S.Ct. at 1884–85, note 40.

**18.** These rights include a "reasonable right of access to the courts," freedom from "invidious racial discrimination," a reasonable opportunity "to exercise [the right] of religious freedom," due process, etc. *Hudson*, — U.S. at —, 104 S.Ct. at 3198.

**19.** There is no distinction between pretrial detainees and convicted inmates in reviewing challenged security practices. Pretrial detainees do not "pose any lesser risks than convicted

" '[C]entral to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves.' ... Prison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel and to prevent escape or unauthorized entry. Accordingly, we have held that even when an institutional restriction infringes a specific constitutional guarantee, such as the First Amendment, the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security. *Jones v. North Carolina Prisoner's Labor Union, supra,* [433 U.S. 119] at 129 [97 S.Ct. 2532 at 2540, 53 L.Ed.2d 629 (1977)]; *Pell v. Procunier, supra,* [417 U.S. 817] at 822, 826 [94 S.Ct. 2800 at 2804, 2806, 41 L.Ed.2d 495 (1974)]; *Procunier v. Martinez, supra,* [416 U.S. 396] at 412–414 [94 S.Ct. 1800 at 1810–1812, 40 L.Ed.2d 224 (1974)]." (441 U.S. at 547, 99 S.Ct. at 1878.)

◼ Therefore, in considering an attack upon a specific restriction imposed for purposes of "maintaining security and preserving internal order" in jails or prisons, lower courts must heed the Supreme Court's warning that these matters "are peculiarly within the province and professional expertise of corrections officials." *Bell v. Wolfish,* 441 U.S. at 540–41, 99 S.Ct. at 1874–75; *Block,* —— U.S. at ——, 104 S.Ct. at 3232. And, in the absence of "substantial evidence" which indicates that these officials have "exaggerated their response to these considerations," courts should defer "to their expert judgment in such matters." [20] *Block,* at ——, 104 S.Ct. at 3232. Indeed, the Supreme Court emphasized that:

"... the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. *Jones v. North Carolina Prisoners' Labor Union, supra,* [433 U.S.] at 128 [97 S.Ct. at 2539]; *Procunier v. Martinez, supra,* [416 U.S.] at 404–405 [94 S.Ct. at 1807]; *Cruz v. Beto, supra,* [405 U.S. 319] at 321 [92 S.Ct. 1079 at 1081, 31 L.Ed.2d 263 (1972)]; see *Meachum v. Fano,* 427 U.S. [215] at 228–229 [96 S.Ct. 2532 at 2540–2541, 49 L.Ed.2d 451 (1976)]." (441 U.S. at 547, 99 S.Ct. at 1878.)

◼ For these reasons, the Supreme Court has continually reaffirmed *"the very limited role* that courts should play in the administration of detention facilities." *Block,* —— U.S. at ——, 104 S.Ct. at 3232. And, the Court has specifically upheld security restrictions, like those challenged in the present case concerning random "strip searches" and "publisher-only" rules. [21]

inmates"; indeed, "it may be that in certain circumstances they present a greater risk to jail security and order." *Bell v. Wolfish,* 441 U.S. at 546, note 28, 99 S.Ct. at 1878, note 28.

**20.** This "substantial deference" that must be accorded prison or jail officials applies to their decisions concerning pretrial detainees, as well as convicted inmates. *Bell v. Wolfish,* 441 U.S. at 547, note 29, 99 S.Ct. at 1878, note 29.

**21.** There is one technical difference between a court's review of security restrictions as they apply to convicted inmates and as they apply to pretrial detainees. A sentenced inmate may not be subject to "cruel and unusual punishment" under the Eighth Amendment. However, a person committed to pretrial detention has not been convicted of a crime, and there can be no "punishment" prior to an adjudication of guilt

"in accordance with due process of law under the Fifth Amendment." *Bell v. Wolfish,* 441 U.S. at 535, 541, 99 S.Ct. at 1872. Therefore, as to a pretrial detainee, the proper inquiry is whether the restrictions "amount to punishment of the detainee." *Id.,* at 535, 99 S.Ct. at 1872. And, if a particular restriction of pretrial detention is "reasonably related to a legitimate government interest, it does not, without more, amount to 'punishment.'" *Id.,* at 539, 99 S.Ct. at 1874.

In this case, the plaintiff was a convicted inmate at all relevant times. However, the Dallas County Jail houses both pretrial detainees and convicted inmates—and the security restrictions being attacked in this case are applied equally to both groups of prisoners. As discussed later, the evidence established that the restrictions are not improper or unconstitutional, whether applied to convicted inmates or pre-

## b. Dirty Books

In *Bell v. Wolfish,* the Supreme Court approved the "publisher-only" rule of the Bureau of Prisons, which permitted inmates to receive books from outside the institution only if the materials were mailed directly from the publisher or a book club. (441 U.S. at 548–52, 99 S.Ct. at 1878–81).

The warden had testified (by affidavit) that, in order to maintain security, prison officials would "have to leaf through every page of all books and magazines to ensure that drugs, money, weapons, or other contraband were not secreted in the material" —and that this search process would "take a substantial and inordinate amount of available staff time"—while the security problems were substantially reduced by the "publisher-only" rule since "there was relatively little risk that material received directly from a publisher or book club would contain contraband." According to the prison officials, the Supreme Court stated:

"... There is simply no evidence in the record to indicate that [prison] officials have exaggerated their response to this security problem and to the administrative difficulties posed by the necessity of carefully inspecting each book mailed from unidentified sources. Therefore, the considered judgment of these experts must control in the absence of prohibitions far more sweeping than those involved here. See *Jones v. North Carolina Prisoners' Labor Union,* 433 U.S., at 128 [97 S.Ct., at 2539]; *Pell v. Procunier,* 417 U.S., at 827 [94 S.Ct., at 2806].

"Our conclusion that this limited restriction on receipt of hardback books [22] does not infringe the First Amendment rights of [prison] inmates is influenced by several other factors. The rule operates in a neutral fashion, without regard to the content of the expression. *Id.,* at 828 [94 S.Ct., at 2807]. And there are

alternative means of obtaining reading material that have not been shown to be burdensome or insufficient...." (441 U.S. at 551, 99 S.Ct. at 1880.)

## c. Dirty Looks

*Bell v. Wolfish* also approved a security restriction involving "strip searches," in which the inmates were "required to expose their body cavities for visual inspection as part of a strip search conducted after every contact visit with a person from outside the institution." (441 U.S. at 558–69, 99 S.Ct. at 1884–90).

Here, the prison officials testified that "visual cavity searches were necessary not only to discover but also to deter the smuggling of weapons, drugs, and other contraband into the institution." The Supreme Court held that these strip searches did not violate the Fourth Amendment, so long as they were conducted in a reasonable manner (441 U.S. at 560, 99 S.Ct. at 1885), stating:

"... a detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence. And inmate attempts to secrete these items into the facility by concealing them in body cavities are documented in this record, App. 71–76, and in other cases. E.g., *United States v. Ferraro,* 590 F.2d 335 (CA 6 1978); *United States v. Park,* 521 F.2d 1381, 1382 (CA9 1975)....

"We do not underestimate the degree to which these searches may invade the personal privacy of inmates. Nor do we doubt, as the District Court noted, that on occasion a security guard may conduct the search in an abusive fashion. [*United States ex rel. Wolfish v. Levy* ] 439 F.Supp. [114] at 147 [ (D.C.N.Y. 1977) ]. Such abuse cannot be condoned. The searches must be conducted in a

trial detainees. See *Bell v. Wolfish,* at 547, note 29, 99 S.Ct. at 1878, note 29.

**22.** The restriction had been amended to apply only to hardback books, and to permit inmates to receive soft-bound books and magazines from

any source. *Id.,* 441 U.S. at 551, 99 S.Ct. at 1880. In addition, the prisons had a "relatively large library for use by inmates." *Id.,* at 552, 99 S.Ct. at 1881.

reasonable manner. *Schmerber v. California, supra,* [384 U.S. 757] at 771–772 [86 S.Ct. 1826, 1836–1837, 16 L.Ed.2d 908 (1966) ]. But we deal here with the question whether visual body-cavity inspections as contemplated by the [prison] rules can **ever** be conducted on less than probable cause. Balancing the significant and legitimate security interests of the institution against the privacy interests of the inmates, we conclude that they can." (441 U.S. at 559–60, 99 S.Ct. at 1884–85).

In subsequent decisions, the Supreme Court (i) approved a county jail's practice of conducting random, irregular 'shakedown' searches of cells while the pretrial detainees were away at meals, recreation, or other activities, *Block v. Rutherford, supra;*[23] and (ii) held that convicted inmates have no reasonable expectation of privacy in their prison cells entitling them to Fourth Amendment protection against unreasonable searches. *Hudson v. Palmer, supra.* The Supreme Court stated in *Hudson:*

"The administration of a prison, we have said, is 'at best an extraordinarily difficult undertaking.' *Wolff v. McDonnell,* 418 U.S. [539], at 566 [94 S.Ct. 2963, at 2780, 41 L.Ed.2d 935 (1974) ]; *Hewitt v. Helms,* 459 U.S. 460, [467] [103 S.Ct. 864, 869, 74 L.Ed.2d 675] (1983). But it would be literally impossible to accomplish the prison objectives identified above if inmates retained a right of privacy in their cells. Virtually the only place inmates can conceal weapons, drugs, and other contraband is in their cells. Unfettered access to these cells by prison officials, thus, is imperative if drugs and contraband are to be ferretted out and sanitary surroundings are to be maintained.

.    .    .    .    .

"... The uncertainty that attends random searches of cells renders those searches perhaps the most effective weapon of the prison administrator in the constant fight against the proliferation of knives and guns, illicit drugs, and other contraband.... A requirement that even random searches be conducted pursuant to an established plan would seriously undermine the effectiveness of this weapon. It is simply naive to believe that prisoners would not eventually decipher any plan officials might devise for 'planned random searches,' and thus be able routinely to anticipate searches...." (—— U.S. at ——, ——, 104 S.Ct. at 3200, 3201.)

## 3. THE PLAINTIFF LOSES

Applying the principles of these Supreme Court cases to the facts established at trial, it is clear that the plaintiff's claims are baseless. The defendants did not, as the plaintiff claims, violate his constitutional rights by keeping him from looking at pictures of nude women in magazines—while permitting females to look at his nude body during strip searches.

### a. *Dirty Books*

■ The "publisher-only" rule of the Dallas County Jail is valid. The jail officials testified that contraband—cash, narcotics, razor blades, etc.—could be hidden in magazines and paperbacks, just as easily as in hard-cover books. Their testimony also established that the county simply did not have sufficient personnel to examine all of the books and magazines for security purposes. Therefore, although this restriction is broader than the "publisher-only" rule applied to hard-back books in *Bell v. Wolfish,* it is still a rational response by jail officials to an obvious security problem.[24]

■ The "content" restriction—prohibiting magazines and books that "depict nudity" or "pander to sexual interest"—was

---

**23.** The *Block* opinion specifically noted that the security practice of conducting "irregular or random searches" had been approved in *Bell v. Wolfish,* 441 U.S. at 555, 99 S.Ct. at 1882. See

*Block,* —— U.S. at —— – ——, 104 S.Ct. at 3234–3235.

**24.** See *Cotton v. Lockhart,* 476 F.Supp. 956 (E.D. Ark, 1979), aff'd, 620 F.2d 670 (8th Cir.1980).

also justified. The jail officials testified that material of this nature may lead to violence because the inmates "would fight over who could see, or who may have stolen," a magazine with pictures of nude women. Although this restriction may not exist in some other institutions,[25] the director of the Dallas County Jail testified about his personal experience with such inmate violence in another county jail in Texas. Moreover, the Hon. Sarah T. Hughes of this Court—in a landmark case in which she was responsible for improving the horrible conditions which then existed at the Dallas County Jail[26]—instructed the defendants to enforce the rule prohibiting magazines "with pictures of nude women and guns and stories of crimes." See *Taylor v. Sterrett,* 344 F.Supp. 411, at 415, 423.

The only evidence presented by the plaintiff on this issue was his testimony that it was important for inmates "to see naked women," since it "relieved their tensions" —although he objected to such magazines being given to "sexual offenders," since there was no way to predict "who will commit homosexual rape." This certainly falls far short of any "substantial evidence" that the Dallas County Jail officials "have exaggerated their response" to the obvious security problems. Therefore, under *Bell v. Wolfish,* this Court must accord deference to the "publisher-only" rule and its content restriction.[27]

**b. *Dirty Looks***

■ Contrary to the plaintiff's claims, there were no dirty looks in connection with the two strip searches. The females who participated did not—and, indeed, could not—have seen the nude bodies of Wagner and the other inmates during the strip searches. Moreover, his claim that females should not even be in the men's jail is absurd: not to use females would result in an even more severe shortage of personnel to run the jail; and, it would be obvious discrimination against females, which would subject the county to claims for injunctive relief and damages.[28]

In addition, there was adequate cause for both strip searches. One resulted from information about a possible weapon, and the jail officials would have been remiss in protecting the inmates had they not attempted to find it. And, the Supreme Court has specifically approved the use of random searches as an effective means to control weapons, drugs and other contraband. *Hudson v. Palmer, supra; Block v. Ruthford, supra; Bell v. Wolfish, supra.*

■ Finally, the plaintiff's claim that he should not have been searched in the presence of other inmates or deputies is also baseless. The evidence established that (i) there would be severe security risks in attempting to conduct individual strip-

---

**25.** At the Texas Department of Corrections, publications are not excluded *solely* because they have sexual content. See *Guajardo v. Estelle,* 568 F.Supp. 1354, 1364 (S.D.Tex.1983). However, the Supreme Court has noted that jails— which house both pretrial detainees and convicted inmates—may present greater risks of security than prisons. *Bell v. Wolfish,* 441 U.S. at 546, note 28, 99 S.Ct. at 1878, note 28. Moreover, jail officials need not cite actual incidents of violence or security problems in order to justify restrictions on prisoner's rights; instead, a showing of a reasonable belief of potential problems is sufficient. *Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 127–28, 97 S.Ct. 2532, 2538–39, 53 L.Ed.2d 629 (1977).

**26.** Among other problems which existed then, the Dallas County Jail had repeated assaults and homosexual rapes of inmates by other inmates. Accordingly, the periodic orders entered by

Judge Hughes in *Taylor v. Sterrett* reflect her concern—which is still shared by present jail officials—with anything, including the ban on magazines with nude pictures of females, that would reduce or eliminate violence in the Dallas County Jail. See *Taylor v. Sterrett,* 344 F.Supp. 411 (D.C.Tex.1972).

**27.** It is not necessary for this Court to address the conflicting arguments, and the expert testimony presented by the defendants, concerning whether or not magazines like *Easyriders* would actually increase the possibility of sexual offenses by inmates in jails or prisons. But see footnotes 7 and 25.

**28.** The evidence established that women comprise almost one-third of the total force of jail guards, but that only 10% of the inmates are females.

searches of the inmates; (ii) that the random searches would be rendered almost useless unless all inmates in a tank were removed from their cells at the same time, and before they could hide things; and (iii) that the manner in which these strip searches were conducted was the most effective and efficient to perform this unpleasant, but necessary security measure. See *Bell v. Wolfish, supra.*

The plaintiff totally failed to present any evidence, much less "substantial evidence," that the defendants exaggerated their response to the obvious security problems. Accordingly, under *Bell v. Wolfish*, this Court accords deference to the strip-search policies of the Dallas County Jail.

For these reasons, this case is DISMISSED with prejudice, with judgment entered in favor of all defendants and with costs taxed against the plaintiff, Richard Wagner.